**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                           No. CR 14-1065 JB

LESLIE CHAPMAN,

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before Court on the Motion for <u>Daubert</u> Hearing and to Exclude Testimony Offered to Bolster Testimony from Another Witness, filed September 10, 2014 (Doc. 32)("Motion"). The Court held a hearing on September 12, 2014. The primary issues are: (i) whether the testimony of Gail Starr, Plaintiff United States of America's proffered expert, concerning self-injury and self-harm in victims of domestic abuse and concerning Non-Suicidal Self-Injury ("NSSI") Disorder is reliable; (ii) whether Starr's testimony concerning NSSI Disorder is relevant; (iii) whether the rest of Starr's testimony, which concerns self-harm and self-jury in domestic abuse victim's as a coping mechanism, is relevant; (iv) whether the danger of undue prejudice substantially outweighs the probative value of Starr's testimony; and (v) whether Starr's testimony would usurp the jury's function in determining the credibility of witnesses, particularly, that of Dana Chapman, the alleged victim. Because testimony concerning NSSI Disorder is not relevant in this case, because Starr's remaining testimony is relevant, because Starr's testimony is reliable, because the danger of undue prejudice does not substantially outweigh the probative value of Starr's testimony, and because Starr's testimony

will not usurp the jury's function of determining the credibility of witnesses, the Court will grant the Motion in part and deny it in part.

## FACTUAL BACKGROUND

The Amended Information alleges that Defendant Leslie Chapman, on or about January 26, 2014, "unlawfully touch[ed] and appl[ied] force to the person of a household member[, his wife -- D. Chapman --] with intent to injure that person" at the "Veterans Affairs Medical Center in Bernalillo County, in the District of New Mexico."  Amended Information at 1, filed April 4, 2014 (Doc. 12)("Amended Information").   In doing the "unlawful touch[ing]," L. Chapman allegedly caused D. Chapman "temporary disfigurement and temporary loss and impairment of the function of" a "member of the [person's] body."  Amended Information at 1.  The Amended Information also alleges that L. Chapman prevented, obstructed, and delayed the "sending, transmitting, conveying and delivering" of a "message, communication and report by and through telephone."  Amended Information at 1-2.  The Amended Information further alleges that L. Chapman knowingly possessed and carried a firearm "on the property of the Veterans Affairs Medical Center, Albuquerque, with no official purpose."  Amended Information at 1.

## PROCEDURAL BACKGROUND

Trial was set to begin in this case on September 18, 2014.  See Order Granting Continuance of Trial Setting and Setting a Definite Date for Trial at 2, filed June 30, 2014 (Doc. 28).  Nine days before trial was to begin, the United State filed a notice of its intention to call Starr as an expert witness.  See Notice of Intent to Offer Expert Testimony ¶ 1, at 1, filed September 9, 2014 (Doc. 31)("Notice").  The next day, L. Chapman filed the Motion to exclude Starr's testimony.  Motion at 1.  Two days later, the Court held a hearing on September 12, 2014 -- six days before trial was set to begin.  At the hearing, the Court ruled that it would grant the

Motion in part and deny it in part.  See Transcript of Hearing, taken September 12, 2014, at 39:11-41:4 (Court)("Tr.").[1]  In light of its ruling, and the close proximity to trial in which the Motion was filed, L. Chapman was "[u]nprepared for trial."  Tr. at 41:6 (Robert).  Both parties agreed to a continuance, and the Court reset the trial date.  See Tr. at 41:7-11 (Mott, Court); id. at 42:10-24 (Robert, Mott, Court).

**1.      Starr's Proffered Testimony.**

The United States represents that Starr's testimony will focus on injuries that D. Chapman presented on her chest.  See Notice ¶ 1, at 1.  Starr is a certified Sexual Assault Nurse Examiner and is certified in Trauma Nurse Core Curriculum.  See Notice ¶ 1, at 1.  She has a Bachelor of Science in Psychology, an Associate's Degree in Nursing, and a Master of Science-Criminal Justice Administration from Loyola University.  See Notice ¶ 2, at 2.  Starr is expected to testify that she has conducted "approximately 400 examinations of victims of trauma involving domestic violence and/or sexual assault."  Notice ¶ 1, at 1-2.  Starr will testify that she has worked with "patients with acute traumatic experiences for the past 17 years," and "that a number of the patients she came into contact with were in the acute care unit for adults and teens at the University of New Mexico," where she worked as a Mental Health Technician in the Trauma/Surgical/Burn Intensive Care Unit.  Notice ¶ 1, at 2. Starr will also testify that her work as a Sexual Assault Nurse Examiner and Domestic Violence Nurse Examiner "has given her a large amount of experience in recognizing and treating patients who have undergone significant trauma, which often includes self-harm."  Notice ¶ 1, at 2.

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

Starr's testimony will "discuss the overall reasons why patients present self-harm injuries."  Notice ¶ 2, at 2.  Starr will testify that that self-harm "is often a coping mechanism to internal distress, albeit an unhealthy coping mechanism."  Notice ¶ 2, at 2.  Starr will testify that there are a variety of injuries that fall under the category "of non-suicidal self-injury."  Notice ¶ 2, at 2.  Additionally, Starr will testify that self-harm has "been connected to patients with post-traumatic stress."  Notice ¶ 2, at 2.

The United States requests "that the Court exercise its 'special gatekeeping obligation' and determine that" Starr's proposed testimony "is admissible, as the witness has a 'reliable basis in knowledge and experience' in her respective discipline."  Notice ¶ 3, at 3 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).  The United States argues that "it intends to introduce photographs . . . that will show abrasions positioned diagonally across the victim's chest" and photographs "taken earlier" that "do not show the abrasions."  Notice ¶ 3, at 3.  The United States contends that there may be an implication that "the victim caused the injury to herself with a malicious intent to further implicate the Defendant in the alleged conduct," and that Starr's testimony "is necessary to explain the prevalence of such self-injurious conduct in traumatic situations, namely domestic violence in this case, and to prevent confusion by the jury over the proper relevance of the abrasions."  Notice ¶ 3, at 3.  The United States further asks the Court to treat the Notice "as a proffer on the training and background" of Starr and permit her testimony to be introduced.  Notice ¶ 4, at 3.

## 2. __The Motion, Reply, and Response__.

L. Chapman objects to Starr's testimony.  See Motion at 1.  L. Chapman argues that the "only conceivable purpose for [Starr's] testimony would be to bolster the anticipated testimony of the alleged victim that she scratched herself for reasons other than to inculpate Mr. Chapman."

Motion ¶ 4, at 2.   L. Chapman objects to the testimony on four grounds: (i) that the "proposed expert testimony would not be helpful to the jury"; (ii) that the "very questionable probative value of the proposed testimony would be substantially outweighed by the danger or [sic] unfair prejudice"; (iii) that the "proposed testimony would usurp the jury's function in determining the credibility of witnesses"; and (iv) that "the proposed expert testimony is not adequately based on relevant empirical research."  Motion ¶ 5, at 2.  L. Chapman argues that, before expert testimony can be presented, it must meet the three requirements of rule 702 of the Federal Rules of Evidence: (i) "the testimony is based upon sufficient facts or data"; (ii) "the testimony is the product of reliable principles and methods"; and (iii) "the witness has applied the principles and methods reliably to the facts of the case."   Motion ¶ 6, at 3.   L. Chapman contends that the D. Chapman will likely testify that her purpose in scratching herself after the incident was for some other reason than to inculpate L. Chapman and that Starr's testimony will likely be that someone in D. Chapman's situation might scratch themself because of the psychological impact of abuse.  See Motion ¶ 7, at 3.   L. Chapman further argues that Starr has experience with treating women who have been "the victims of substantial abuse, sexual and physical," and that D. Chapman does not fall within the category of women who have endured substantial physical and sexual abuse, because there "is no history of physical abuse."  Motion ¶ 7, at 3.  L. Chapman contends that, in this instance, he did not strike or touch D. Chapman except in an "effort to avoid further injury at the hands of the alleged victim."  Motion ¶ 7, 3-4.  L. Chapman argues that because D. Chapman falls outside the category of women with whom Starr has dealt, Starr's "testimony would not be helpful to the jury in this case."  Motion ¶ 7, at 4.

L. Chapman also argues that the probative value of Starr's testimony is "substantially outweighed by the danger of unfair prejudice," because Starr's testimony will only bolster

D. Chapman's anticipated testimony and the "outcome of the trial in this case will hinge in substantial part on the credibility of the alleged victim."   Motion ¶ 8, at 4 (citing Fed. R. Evid. 403).   L. Chapman contends that "bolstering the testimony of the alleged victim . . . is not a proper purpose for the admission of expert testimony."   Motion ¶ 9, at 4.   L. Chapman argues that the "'credibility of witnesses is generally not an appropriate subject for expert testimony,'" and that such "testimony is often excluded because it usurps a critical function of the jury and because it is not helpful to the jury."   Motion ¶ 9, at 5 (quoting United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993)).   L. Chapman also contends that Starr's expertise is "in the area of sexual abuse and assault," which may be relevant and helpful to the jury in another case, but not in this case.   Motion ¶ 10, at 5-6.   L. Chapman argues that the "application of inapposite expertise is no better than junk science where the case doesn't fit the expertise," which "is the situation here."   Motion ¶ 10, at 6.   L. Chapman contends that, in "the absence of recognized, peer-reviewed and generally accepted research addressing a fact situation relevant to the one presented in this case, the proposed expert testimony would lack the necessary empirical grounding to pass this Court's gatekeeping function."   Motion ¶ 11, at 6.

The United States responds by arguing that Starr's proffered testimony "complies with Rule 702, which is the rule that principally governs the admissibility in federal courts."   United States' Response to Defendant's Motion for Daubert Hearing and to Exclude Testimony Offered to Bolster Testimony from Another Witness (Dkt. 32) at 3, filed September 12, 2014 (Doc. 38)("Response").   The United States directs the Court to rule 702, and argues that the sufficiency of an expert's knowledge, skill, experience, training, and education is "a quantitative, not qualitative analysis."   Response at 4 (citing Fed. R. of Evid. 702).   The United States argues that the methodology used by "Starr is a widely recognized reliable methodology, applied

reliably to the facts of this case."  Response at 5.  The United States argues that Starr's resume shows that she has "a specialized understanding based on training, education and practical experience acquired over time in cases relevant to domestic violence situations."  Response at 6. The United States argues that the jury will need to determine whether D. Chapman was indeed the victim and will consider if D. Chapman acted in a manner that is consistent with that of a victim, and that, if D. Chapman did act in a manner that a victim of abuse would, it is "more likely that she may have been a victim."  Response at 6.  Because the scratches "are a key part of the overall story" and the jury will form an opinion about the scratches, the United States argues that it would be helpful to the jury to form "that opinion with the assistance of expert testimony to give proper meaning and weight to the photographs" of the scratches, which "is relevant evidence."  Response at 6.  The United States maintains that the "threshold for relevance . . . is not a high one."  Response at 6.

As to reliability, the United States argues that NSSI[2] is not an issue of first impression nor "is it opinion evidence that is 'connected to existing data only by the ipse dixit of the expert.'"  Response at 6 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 157 (1993)).  The United States argues that the "existence of NSSI is sufficiently established that this Court can and should take judicial notice of that malady under Federal Rule of Evidence 201." Response at 6.  The United States contends that judicial notice "is limited to the fact that NSSI is a recognized malady and is included in [the Diagnostic and Statistical Manual of Mental Disorders ("DSM") IV] as a symptom and the updated DSM V as a disorder."  Response at 6-7.

---

[2]The term NSSI may refer to a particular disorder or to self-injury and self-harm in general.  The parties use the term NSSI in a manner that at times appears to refer to the disorder and at times appears to refer to self-injury and self-harm in general.  When the usage is obvious, the Court will clarify whether the parties are referring to NSSI Disorder or to self-injury in general.  If it is unclear in what manner the parties are using the term NSSI, the Court will merely reiterate their arguments or statements, without clarification.

The United States tendered snippets of articles "as a small sampling of the evidence that NSSI is well recognized, with numerous published articles in peer reviewed journals."   Response at 7. The United States argues that as "long as an expert 'meets the threshold established by Rule 702 as explained in <u>Daubert</u>,[3] the expert may testify and the jury decides how much weight to give that testimony.'"   Response at 7 (quoting <u>Primiano v. Cook</u>, 598 F.3d 558, 565 (9th Cir. 2010)).

The United States also argues that Starr's testimony is more probative than prejudicial, because it "will assist the jury to decide whether it is more or less likely that" the victim "scratched herself by accident, in revenge, as a coping mechanism, or for other reasons." Response at 7.  The United States contends that, if D. Chapman were indeed a victim, "then the scratches need to be explained lest a jury mistakenly assume that the *only* reason for such an act was fabrication to inculpate her husband in the incident."   Response at 7 (emphasis in the original).  The United States contends that Starr's testimony will "discuss how the incident and the scratches *might be* related, and it is essential to assist the jury in the decision it will have to make about who was the aggressor."   Response at 7 (emphasis in the original).  The United States addresses L. Chapman's argument that Starr's testimony is "simply offered to bolster the testimony of the alleged victim" by contending that Starr's testimony "will give the trier of fact, the jury, as much information as possible as to why the alleged victim might have self-harmed," and that L. Chapman "will have the opportunity to cross-examine not only the alleged victim as to her motivation for scratching herself, but also" Starr, "as to her opinions and bases for those opinions."   Response at 8.

---

[3]In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, the Supreme Court of the United States held that the Federal Rules of Evidence assign to the trial judge the task of ensuring that scientific evidence is sufficiently reliable such that it will assist a trier of fact.  <u>See</u> 509 U.S. at 592-94.

The United States contends that Starr "cannot and will not testify that D.[ Chapman] suffered from NSSI before, during, or after the incident," and that Starr "cannot rule out that D.[ Chapman] did not maliciously create the scratches with the intent to inculpate [L.] Chapman."  Response at 9.  The United States asserts that Starr's "testimony will be limited to preclude inappropriate opinions beyond the scope of what can be reasonably concluded with the available evidence."  Response at 9.  The United States argues that L. Chapman "has not presented a sufficient basis for the Court to exclude" Starr's testimony.  Response at 9.

The United States attached Starr's Curriculum Vitae to the Response.  Starr's Curriculum Vitae states that she works as a registered intensive care unit nurse at the University Hospital in the Trauma/Surgical/Burn Intensive Care Unit.  See Gail Starr, RN, BS, MSCJA, Curriculum Vitae at 1, filed September 12, 2014 (Doc. 38-1)("Starr CV").  She also serves as a Sexual Assault Nurse Examiner ("SANE") by providing medical assessment and treatment, collecting forensic evidence, and documenting findings and sexual assault history.  See Starr CV at 1.  Starr additionally mentors and leads the nurses for the SANE unit as a clinical coordinator.  See Starr CV at 1.  From January, 2001, to August, 2007, Starr worked as a staff nurse and charge nurse at the University Hospital, providing direct patient care and supervising staff.  See Starr CV at 1.  From 1998 to 2004, Starr worked as a Mental Health Technician at the University Hospital.  See Starr CV at 1.  As a Mental Health Technician, Starr worked "in the acute care unit for adults and teenagers, provided direct patient care including: active listening, ensuring patient safety, body checks, crisis intervention, vital signs, and verbal de-escalation."  Starr CV at 1.

The United States also attached a number of articles concerning self-harm and NSSI Disorder to the Response.  The United States attached a Google Scholar search of articles dealing with self-injury.  See Self-Injury Google Scholar Search (Sept. 10, 2014), filed September 12,

2014 (Doc. 38-2)("Scholar Search").[4]  The United States attached an article titled "Self-Injury" from the University of Massachusetts Medical School's website, which describes the risks and signs of self-injury and provides ways to help people who engage in self-injury.  Self-Injury, U. Mass. Med. Sch., http://www.umassmed.edu/eap/Resources/Emotional-and-Mental-Health/ Self-Injury/, filed September 12, 2014 (Doc. 38-3)("U. Mass.").  The United States attached an article from the Mayo Clinic titled "Self-Injury/Cutting."  Self-Injury/Cutting, Mayo Clinic, (Dec. 6, 2012) http://www.mayoclinic.org/diseases-conditions/self-injury/basics/definition/con-20025897,       http://www.mayoclinic.org/diseases-conditions/self-injury/basics/symptons/con-20025897, filed September 12, 2014 (Doc. 38-4)("Mayo Clinic").  This article defines self-injury by stating:

> Self-injury, also called self-harm, is the act of deliberately harming your own body, such as cutting or burning yourself.  It's typically not meant as a suicide attempt.  Rather, self-injury is an unhealthy way to cope with emotional pain, intense anger and frustration.
>
> While self-injury may bring a momentary sense of calm and a release of tension, it's usually followed by guilt and shame and the return of painful emotions.  And with self-injury comes the possibility of more serious and even fatal self-aggressive actions.
>
> Because self-injury is often done impulsively, it can be considered an impulse-control behavior problem.  Self-injury may be linked to a variety of mental disorders, such as depression, eating disorders and borderline personality disorder.

Mayo Clinic at 1.  The Mayo Clinic article also lists symptoms of self-injury and different forms of self-injury.  See Mayo Clinic at 2.  The United States also attached to the Response an article

---

[4]The United States refers to Starr's Curriculum Vitae as "Exhibit 1" in the Response, but does not attach any label to the CV itself.  Response at 6; Starr CV at 1.  As for the articles attached to the Response, the United States has affixed labels designating the articles as Exhibits 2-6.  The Court will refer to Starr's CV as "Starr CV," but will refer to the articles by their names.

from the Emergency Medicine Journal titled "The Association Between Domestic Violence and Self Harm in Emergency Medicine Patients," which discusses a study comparing the "rates of self harm among victims of domestic assault" and other emergency department[5] patients. A. Boyle, P. Jones, & S. Lloyd, <u>The Association Between Domestic Violence and Self Harm in Emergency Medicine Patients</u>, Abstract, Emergency Medicine Journal (March 14, 2006), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2564159/, filed September 12, 2014 (Doc. 38-5)("Emergency Medicine").  The study concludes that domestic assault "victims have much greater risks of self harm than other" emergency department patients and that multiple "episodes of violence are associated with increas[ed] episodes of self harm."  Emergency Medicine at 4.  The United States also attached to the Response an article from about.com titled "Non-Suicidal Self-Injury Disorder."  <u>See</u> <u>Non-Suicidal Self-Injury Disorder</u>, about.com (Sept. 3, 2013), http://ptsd.about.com/od/glossary/g/Non-Suicidal-Self-Injury-Disorder.htm, filed September 12, 2014 (Doc. 38-6)("NSSI Disorder").  This article defines NSSI Disorder as "the deliberate and direct destruction or alteration of body tissue without conscious suicidal intent, but resulting in injury severe enough for tissue damage to occur."  NSSI Disorder at 1.  NSSI Disorder behaviors include, among other things, severe scratching.  <u>See</u> NSSI Disorder at 1.  The article notes that the mental health professionals have proposed that NSSI Disorder be included in the DSM V.  <u>See</u> NSSI Disorder at 1.  The article states that an NSSI Disorder diagnosis

---

[5]The Emergency Medicine Journal article uses the term "emergency department" instead of "emergency room."  A. Boyle, P. Jones, & S. Lloyd, <u>The Association Between Domestic Violence and Self Harm in Emergency Medicine Patients</u>, Abstract, Emergency Medicine Journal (March 14, 2006), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2564159/, filed September 12, 2014 (Doc. 38-5).  The term "emergency room" is more common in North America; however, the terms "emergency department" and "emergency room" both refer to "a medical treatment facility specializing in acute care of patients who present without prior appointment, either by their own means or by ambulance."  <u>Emergency Department</u>, Wikipedia.org, http://en.wikipedia.org/wiki/Emergency_department (last visited October 21, 2014).

requires that a person (i) "intentionally cause damage to his or her body on five or more days" in the last year; (ii) the injury is associated with negative  emotions, emotional pain, urges to engage in self-injury, or occurs after the person engaged in a behavior that he or she has difficulty resisting; (iii) self-injury results "in heightened distress or problems in various areas of the person's life"; and (iv) the "self-injury does not occur when a person is experiencing psychotic symptoms, delirium, or intoxication."  NSSI Disorder at 2.

L. Chapman replies by arguing that, after the incident, "the alleged victim made a statement . . . indicating that Mr. Chapman had scratched her chest and neck."  Mr. Chapman's Reply to Government's Response to Motion for Daubert Hearing and to Exclude Testimony Offered to Bolster Testimony from Another Witness at 1, filed September 12, 2014 (Doc. 41)("Reply").  L. Chapman argues that the "alleged victim wrote a statement in which she repeated that accusation."  Reply at 1.  L. Chapman also asserts that, several hours after the incident, "the alleged victim posed for photographs taken by" a police officer showing the scratches and holding a ruler up to the scratches, so that images of the scratches could be preserved to later be used as evidence against L. Chapman.  Reply at 1-2.  L. Chapman argues that Starr's "opinion as to why the alleged victim made those scratches is unnecessary."  Reply at 2.  He contends that D. Chapman "has made it clear that the injuries were inflicted" by L. Chapman in an attempt to support and enhance "her claim that he committed a battery upon her."  Reply at 2.  L. Chapman argues that the Starr's testimony would contradict "the statements of the alleged victim," would "add nothing of assistance to the jury," and would likely only "confuse the jury."  Reply at 2.

3.      **The September 12, 2014, Hearing**.

The Court held a hearing on September 12, 2014.  At the hearing, L. Chapman argued that through discovery he learned that some of the scratches on D. Chapman, which were attributed to L. Chapman, were inflicted after the alleged battery occurred.  See Tr. at 2:5-10 (Robert).  L. Chapman asserted that he hired an expert to examine the photographs taken after the incident to verify that the scratches were inflicted after the alleged assault, and L. Chapman asserted that the United States later told him that D. Chapman had inflicted the scratches on herself.  See Tr. at 2:16-3:2 (Robert).  L. Chapman argued that, after D. Chapman told police that L. Chapman inflicted the scratches and after she admitted that she inflicted the scratches on herself, the United States now wishes to bring in an expert witness to testify that women, who are subjected to domestic abuse, sometimes suffer from NSSI in an attempt to explain why D. Chapman scratched herself.  See Tr. at 3:25-4:20 (Robert, Court).  L. Chapman argued that the United States is trying to use Starr's testimony to undermine the narrative that D. Chapman has created by blaming L. Chapman for the scratches that she inflicted on herself.  See Tr. at 6:21-7:13 (Robert).  L. Chapman contended that Starr's testimony would confuse the jury, because it contradicts the narrative that D. Chapman has already asserted.  See Tr. at 7:22-8:1 (Robert).  L. Chapman stated that he believes that Starr has not examined D. Chapman.  See Tr. at 4:21-23 (Robert).  L. Chapman argued that NSSI is fairly new, and that he is not familiar with the literature about the circumstances in which NSSI manifests itself and what trauma and length of trauma must occur to cause NSSI.  See Tr. 4:24-5:4 (Robert).  L. Chapman argued that he would need to hire his own expert to testify about NSSI and that he would not be able to find an expert before trial starts in less than a week.  See Tr. at 5:5-13 (Robert).

L. Chapman further contended that it is unclear whether the characteristics of NSSI even apply to D. Chapman.  See Tr. at 8:6-10 (Robert).  L. Chapman contended that there is not a history of abuse between D. Chapman and L. Chapman, and that, because NSSI is a post-traumatic stress response to systematic abuse, NSSI does not apply in this case.  See Tr. at 5:14-24 (Robert).  L. Chapman argued that, because there is no evidence of a history of abuse, Starr's testimony is not relevant to the case.  See Tr. at 5:25-6:6 (Robert).  L. Chapman argued that, even if NSSI is a legitimate diagnosis, there is an issue whether it is applicable to the facts in this case, and the Court cannot determine whether the testimony is applicable without first hearing Starr's testimony.  See Tr. at 12:24-13:5 (Robert).  L. Chapman argued that, if Starr were to testify about NSSI and not that D. Chapman suffers from it, then Starr's testimony would be irrelevant, just as having an expert testify to schizophrenia would be irrelevant to the case.  See Tr. at 13:6-20 (Robert, Court).  L. Chapman argued that Starr's testimony would only be relevant if D. Chapman met the diagnostic criteria for NSSI.  See Tr. at 15:18-24 (Robert, Court).

L. Chapman maintained that the Court should exclude Starr's testimony under rule 403 of the Federal Rules of Evidence, because the probative value of Starr's testimony is essentially nonexistent while the possibility of prejudice is substantial.  See Tr. at 8:16-9:6 (Robert).  L. Chapman argued that Starr will essentially present a different narrative of the events than the one that D. Chapman has given.  See Tr. at 9:18-21 (Robert).  L. Chapman noted that Starr may be qualified to testify, but that he does not know enough about NSSI to determine whether her testimony is relevant to this case.  See Tr. at 10:24-11:9 (Robert, Court).

The United States responded by arguing that L. Chapman's objections do not concern Daubert v. Merrell Dow Pharmaceuticals, Inc. or rule 702 of the Federal Rules of Evidence.  See Tr. at 16:22-24 (Mott).  The United States contended that Starr's testimony will assist the jury,

because of Starr's seventeen years of experience dealing with patients who engage in self-harm. See Tr. at 17:8-14 (Mott). The United States conceded that Starr had not examined D. Chapman, and that Starr has only observed pictures of D. Chapman and of the scratches. See Tr. at 17:15-25 (Mott, Court). The United States asserted that Starr's testimony will essentially be that, in her line of work, it is common to find a person who engages in self-harm after suffering a traumatic incident. See Tr. at 18:24-19:6 (Mott). The United States argued that most people outside of the medical profession are not familiar with NSSI, but that Starr is familiar because of her qualifications and training. See Tr. at 19:15-21 (Mott). The United States contended that there is a wide range of NSSI, from Munchausen Syndrome[6] to lesser harm done by victims of domestic and sexual violence. See Tr. at 19:21-20:14 (Mott). The United States asserted that Starr will testify that, when a victim's normal coping mechanisms are unavailable, then the victim may engage in self-harm. See Tr. at 20:8-17 (Mott). The United States argued that Starr will testify that this self-harm is consistent with what happened in this case. See Tr. at 20:17-19 (Mott). The United States noted that D. Chapman will not testify that she engages in self-harm, but instead will testify that she scratched herself, that she does not know why she scratched herself, and that she was traumatized and scared at the time that she scratched herself. See Tr. at

---

[6]Munchausen Syndrome is a syndrome in which

the affected person exaggerates or creates symptoms of illnesses in themselves to gain examination, treatment, attention, sympathy, and/or comfort from medical personnel. In some extreme cases, people suffering from Munchausen's syndrome are highly knowledgeable about the practice of medicine and are able to produce symptoms that result in lengthy and costly medical analysis, prolonged hospital stay and unnecessary operations. The role of "patient" is a familiar and comforting one, and it fills a psychological need in people with this syndrome. This disorder is distinct from hypochondriasis and other somatoform disorders in that those with the latter do not intentionally produce their somatic symptoms.

"Munchausen Syndrome," Wikipedia.org, http://en.wikipedia.org/wiki/M%C3%BCnchausen_syndrome (last visited October 25, 2014).

20:20-21:18 (Mott, Court).  The United States also noted that the D. Chapman's normal coping mechanism is to call her friends or her mother and that, after the incident, D. Chapman did not have a telephone.  See Tr. at 21:19-22 (Mott).  The United States noted that there has not been a history of physical violence between L. Chapman and D. Chapman, but that the relationship was emotionally and verbally abusive, and that L. Chapman was a controlling person.  See Tr. at 22:12-23:5 (Mott, Court).  The United States argued that L. Chapman is going to try to impute a reason behind why D. Chapman scratched herself and that the United States has the right to present evidence that there may be another explanation to why she scratched herself.  See Tr. at 22:4-8 (Mott).

When asked if a person can have NSSI and only engage in one episode of self-harm, the United States noted that a diagnosis of NSSI is usually made after a history of self-harm, but that normal process does not mean that self-harm cannot occur as a single incident.  See Tr. at 23:11-24:21 (Mott, Court).  The Court continued to question to United States whether the literature or other experts agree that a person will engage in self-harm only once and after a single traumatic incident, and the United States maintained that a person can engage in self-injury one time after one traumatic event and then stop.  See Tr. at 23:11-25:15 (Mott, Court).  The United States argued that it is possible for a person to engage in self-harm only once and then stop, and that Starr will testify that she has treated patients who have engaged in self-harm only once after a traumatic situation.  See Tr. at 24:7-25:4 (Mott, Court).  The United States argued that Starr's testimony is relevant, because it would help give the jury a better understanding why someone would harm themself.  See Tr. at 25:18-24 (Mott).  The United States argued that the testimony is also more probative than prejudicial and that L. Chapman will have will have an opportunity to cross-examine both Starr and D. Chapman.  See Tr. at 26:5-11

(Mott).  The United States also argued that D. Chapman did not mention the scratches in the police report, and that, in her written statement, D. Chapman only mentioned scratches on her arm and not her chest.  See Tr. at 26:11-19 (Mott).  The United States, however, later realized that it misspoke and that D. Chapman mentioned the scratches on her chest in the police report. See Tr. at 37:24-38:2 (Mott).  The United States contended that Starr's testimony is not prejudicial merely because it harms L. Chapman's case.  See Tr. at 27:11-14 (Mott).  The United States suggested that the Court grant a short continuance to allow L. Chapman to hire his own expert on the issue.  See Tr. at 27:18-22 (Mott).

The Court directed the United States to an article that the United States attached to the Response, which states that a person must have caused damage to his or her body on five or more days in the last year to be diagnosed with NSSI Disorder.  See Tr. at 32:21-33:1 (Court). The United States responded by arguing that there is a spectrum of self-harm that can occur, which does not necessarily concern NSSI.  See Tr. at 33:2-34:19 (Mott).  The Court asked the United States about what Starr will testify if she cannot testify about NSSI Disorder, because NSSI Disorder requires evidence of multiple occurrences of self-harm.  See Tr. at 34:25-35:3 (Court).  The United States asserted that Starr will testify about self-harm, and that she sees victims of trauma engage in self-injury and self-harm.  See Tr. at 35:4-14 (Mott).  The United States argued that Starr will testify that she sees people engage in self-harm, who have not been diagnosed with NSSI Disorder.  See Tr. at 35:14-18 (Mott, Court).  The United States contended that Starr will testify that, in her experiences, she has observed people engage in self-harm only once after a traumatic situation, and that Starr has observed this phenomenon "quite often." Tr. at 36:16-19 (Mott).  The United States noted that a person engaging in self-harm just once, or even two or three times, does not "necessarily fit the diagnosis of NSSI," but argued that it is still

self-harm, which "falls under the umbrella . . . of NSSI but not to the level of diagnosis." Tr. at 37:15-21 (Mott). The United States addressed L. Chapman's argument that the jury will have to determine whether Starr's testimony is relevant or reliable by arguing that the jury's function is to decide credibility and to determine whether information is relevant, and that L. Chapman's argument goes to "the weight of the evidence and not the admissibility." Tr. at 38:2-16 (Mott).

L. Chapman replied by arguing that, in D. Chapman's statement, she accused L. Chapman of scratching her neck and chest. See Tr. at 28:2-6 (Robert). L. Chapman argued that there has to be a reasonable medical probability that NSSI applies to D. Chapman for Starr's testimony to be admissible. See Tr. at 28:12-16 (Robert). L. Chapman contended that Starr's testimony requires pure speculation, because the jury must make the diagnosis whether D. Chapman suffers from NSSI. See Tr. at 29:11-22 (Robert, Court). L. Chapman argued that permitting Starr to testify about NSSI and then allowing the jury to make the diagnosis based on what they observe at trial is so speculative that it is outside the bounds of what evidence should be allowed at trial. See Tr. 29:22-30:8 (Robert). L. Chapman contended that expert witnesses normally testify about a specific conclusion that is based on their examination of the evidence and their expertise in the subject, while Starr's testimony will be telling the jury about a body of knowledge and telling the jury that NSSI exists, and then leaving the jury to draw its own conclusion. See Tr. at 30:12-25 (Robert).

L. Chapman asserted that he is not questioning the existence of NSSI as a legitimate syndrome, but is arguing that it is not reliable to this specific case. See Tr. at 31:1-13 (Robert). L. Chapman argued that there is danger in allowing the jury to speculate about the applicability of NSSI in this case when there is no evidence, and Starr is not presenting opinions, that create a factual connection to the case. See Tr. at 31:17-32:2 (Robert). L. Chapman contended that,

without this connection, the probative value of the evidence decreases and the unfair prejudice increases.  See Tr. 32:2-5 (Robert).  L. Chapman also addressed the United States' argument that the jury should determine the relevance of evidence by arguing that the Court should determine relevance and not the jury.  See Tr. at 38:20-23 (Robert).

The Court granted the Motion in part and denied it in part, by permitting Starr's testimony, but prohibiting her from testifying about NSSI Disorder.  See Tr. at 39:11-41:4 (Court).  The Court noted the parties had made the process difficult for the Court, because Starr did not testify at the hearing and L. Chapman had not received an opportunity to retain his own expert.  See Tr. 39:11-17 (Court).  The Court expressed its surprise that a person, who had never engaged in self-harm before the traumatic event, would engage in self-injury once after a single traumatic event and never again, but noted that, based on the United States' representations of Starr's testimony -- which was all the Court had, because Starr did not testify at the hearing -- the Court would permit her testimony.  See Tr. at 40:4-19 (Court).  The Court told the parties that, if L. Chapman could find his own expert -- who would testify that "it would be highly extraordinarily unusual for somebody to have a traumatic event and only have one episode of self-cutting," and that testimony was supported by literature -- then the Court may not allow Starr to testify at all.  Tr. at 41:12-18 (Court).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide."  United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).  "The Court now must not only decide whether the expert is qualified to

testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony

is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d

at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the

proffered expert's reasoning to determine if that reasoning is sound." United States v.

Gutierrez-Castro, 805 F. Supp. 2d at 1224.

###    1.    **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

**(a)**    the expert's scientific, technical, or other specialized knowledge
will help the trier of fact to understand the evidence or to
determine a fact in issue;

**(b)**     the testimony is based on sufficient facts or data;

**(c)**    the testimony is the product of reliable principles and methods; and

**(d)**    the expert has reliably applied the principles and methods to the
facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is

proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d

1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the

large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to

land values.").   An expert is "required to possess such skill, experience or knowledge in that

particular field as to make it appear that his opinion would rest on substantial foundation and

would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Electric Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

**2.      The Standard in Daubert v. Merrell Dow Pharm., Inc.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error

rate; (iv) the existence of standards and whether the witness applied them in the present case; and

(v) whether the witness' method is generally accepted as reliable in the relevant medical and

scientific community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is

also to consider whether the witness' conclusion represents an "unfounded extrapolation" from

the data; whether the witness has adequately accounted for alternative explanations for the effect

at issue; whether the opinion was reached for the purposes of litigation or as the result of

independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v.

Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

(1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith Corp., 391
> F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .).  This
> obligation involves a two-part inquiry.  Id.  "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509
> U.S. at 592 . . . .).  In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ."  Id.  (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district
> court must further inquire into whether proposed testimony is sufficiently
> "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

397 F.3d 878, 883-84 (10th Cir. 2005)(footnote omitted).  "The second inquiry is related to the

first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed

expert testimony logically advances a material aspect of the case . . . .  The evidence must have a

valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp.,

397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir.

1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at

591)).  If the expert's proffered testimony fails on the first prong, the Court does not reach the

second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v.

Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony.   See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").   The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharm., Inc., will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.   Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.   And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).   "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.   See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.   As the Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  As the United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503 (citation omitted).

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found

to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific

presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested

hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.  Necessity of Evaluating an Issue Under Daubert v. Merrell Dow Pharmaceuticals, Inc.

The restrictions in Daubert v. Merrell Dow Pharmaceuticals, Inc. apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[7] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel,

---

[7]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

### 4.    Expert Testimony Bolstering Other Witnesses' Credibility.

"The credibility of witnesses is generally not an appropriate subject for expert testimony." United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993). See United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1213 (D.N.M. 2011)(Browning, J.)(excluding expert testimony on whether defendant's confession was credible).

> There are several reasons for the prohibition against expert testimony on other witness' credibility. Such testimony: (1) "usurps a critical function of the jury"; (2) "is not helpful to the jury, which can make its own determination of credibility"; and (3) when provided by "impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury."

United States v. Hill, 749 F.3d 1250, 1258 (10th Cir. 2014)(quoting United States v. Toledo, 985 F.2d at 1470). The bar on credibility bolstering expert testimony is grounded in a number of

evidentiary rules.  See United States v. Charley, 189 F.3d 1251, 1267 n.21 (10th Cir. 1999)(en

banc).  Expert testimony that vouches for the credibility of other witnesses lacks "relevance

[under rule 401] and would not 'assist the trier of fact as required by Rule 702.'"  United States

v. Adams, 271 F.3d 1236, 1246 (10th Cir. 2001)(quoting United States v. Charley, 189 F.3d at

1267).  See United States v. Harry, No. CR 10-1915 JB, 2014 WL 1949993, at *38 (D.N.M. May

5, 2014)(Browning, J.)(concluding that expert's testimony was not relevant if expert testified that

witness' demeanor suggested that the witness was not subjected to a sexual assault, because the

testimony impermissibly went to the witness' credibility).

> Courts have also held that testimony which vouches for the credibility of a
> witness violates other evidentiary rules, such as Rule 608(a)(1) or Rule 403.
> Some courts have held that, although Rule 608(a)(1) "permits testimony
> concerning a witness's general character or reputation for truthfulness," it
> "prohibits any testimony as to a witness's truthfulness on a particular occasion."
> State v. Rimmasch, 775 P.2d 388, 391 (Utah 1989)(construing Utah R. Evid.
> 608); see also United States v. Azure, 801 F.2d 336, 341 (8th Cir. 1986); State v.
> Wood, 194 W. Va. 525, 460 S.E. 2d 771, 778 (W. Va. 1995)(construing W. Va.
> R. Evid. 608); People v. Koon, 713 P.2d 410, 412 (Colo. Ct. App.
> 1985)(construing Colo. R. Evid. 608).  And at least one court has held, in a sexual
> abuse case, that testimony that bolsters the credibility of the complaining witness
> violates Rule 403's balancing test.  United States v. Funds Held in the Name or
> for the Benefit of John Hugh Wetterer, 991 F. Supp. 112, 120-21 (E.D.N.Y.
> 1998).

United States v. Charley, 189 F.3d at 1267 n.21.  See also United States v. Benally, 541 F.3d

990, 995 (10th Cir. 2008)(affirming district court's exclusion of vouching testimony under rule

403's balancing test).  The bar on bolstering a witness' testimony only extends to expert

testimony concerning the credibility of the witness and not to expert testimony that is consistent

with another witness' testimony.  See United States v. Charley, 189 F.3d at 1264.  In United

States v. Charley, the Tenth Circuit held, en banc, that the district court did not err in permitting

an expert witness to testify that the actions and symptoms of two girls were consistent with those

of a sexual assault victim.  See 189 F.3d at 1264.  The expert's testimony was consistent with the

two girls' testimony that they had been sexually assaulted.  See 189 F.3d at 1258.  The Tenth

Circuit held, however, that the district court erred in permitting a psychiatrist to testify that he

believed the girls were sexually assaulted, based on statements the girls made to the psychiatrist,

because the testimony "was essentially vouching for [the girls'] truthfulness."  189 F.3d at 1267.

In United States v. Chaco, 801 F. Supp. 2d 1200 (D.N.M. 2011)(Browning, J.), the Court

permitted a doctor to testify that an examination of a sexual assault victim did not show any

signs of sexual assault but that the majority of physical examinations on sexually assaulted

prepubescent girls result in normal findings.  See 801 F. Supp. 2d at 1216.  The Court permitted

the doctor to testify that the examination, which resulted in no evidence of sexual abuse, was still

consistent with the victim being sexually abused.  See 801 F. Supp. 2d at 1216.  The Court,

however, excluded testimony from the doctor that the victim had been sexually assaulted,

because the doctor knew that the victim was sexually assaulted based on statements that the

victim made to the doctor.  See 801 F. Supp. 2d at 1216.  The Court reasoned that permitting the

doctor to testify that the victim had been sexually assaulted would serve to impermissibly vouch

for the credibility of the witness.  See 801 F. Supp. 2d at 1216 (citing United States v. Velarde,

214 F.3d 1204, 1211 n.6 (10th Cir. 2000)).  The Court however, concluded that the doctor's

testimony that the examination results were consistent with that of a sexual assault victim was

based on the doctor's knowledge and experience, and was, thus, permissible expert testimony.

See United States v. Chaco, 801 F. Supp. 2d at 1216.

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion

of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque,

629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).

"Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"   United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible

under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an

improper basis, commonly, though not necessarily, an emotional one.'"   United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

## ANALYSIS

The Court will grant the Motion in part and deny it in part.  Starr's testimony concerning NSSI Disorder is irrelevant in this case, and, thus, the Court will grant the Motion as to that portion of Starr's testimony and exclude Starr's testimony that concerns NSSI Disorder.  For the rest of Starr's testimony, it is reliable, relevant, and the danger of undue prejudice does not substantially outweigh its probative value.  As such, the Court will deny the rest of the Motion and will permit Starr's remaining testimony that does not concern NSSI Disorder.

## I.   THE COURT WILL EXCLUDE STARR'S TESTIMONY CONCERNING NSSI DISORDER, BECAUSE IT IS IRRELEVANT.

The Court will prohibit Starr from testifying about NSSI Disorder, because the testimony is irrelevant to this case.  Rule 702 states that an expert witness may testify if, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The Tenth Circuit has described this requirement by stating that "proposed testimony is sufficiently 'relevant to the task at hand.'"   Norris v. Baxter Healthcare Corp., 397 F.3d at 884 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 579).  This requirement ensures "that the proposed expert testimony logically advances a material aspect of the case" and that it has "a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2.  Here, testimony about NSSI Disorder does not have any connection to the facts in the case.

The one article that the United States submitted to the Court, which deals with NSSI Disorder, states a person must have "intentionally caused damage to his or her body on five or

more days" in the last year to be diagnosed with NSSI Disorder.  NSSI Disorder at 2.  The

United States has not, however, presented any evidence or indicated that D. Chapman has

engaged in self-harm on more than one occasion.  To the contrary, the United States noted that

D. Chapman will testify that she does not engage in self-injury, but that she did scratch herself

on one occasion.  See Tr. at 20:20-21:18 (Mott, Court).  Based on this representation by the

United States and based on the articles provided to the Court by the United States, there is no

factual basis for concluding that D. Chapman could have NSSI Disorder.  Testimony concerning

NSSI Disorder is, thus, not relevant to this case.  See Norris v. Baxter Healthcare Corp., 397 F.3d

at 884.

Rule 401 defines relevance as evidence that "has any tendency to make a fact more or

less probable than it would be without the evidence" and "the fact is of consequence in

determining the action."  Fed. R. Evid. 401.  Evidence concerning NSSI Disorder will not make

any fact of consequence more or less probable, because D. Chapman does not -- based on the

literature that the United States provided and based on the United States' representations -- have

NSSI Disorder.  Rather, if evidence of NSSI Disorder were presented to the jury, it would likely

cause confusion.  See Fed. R. Evid. 403.  If Starr were to discuss NSSI Disorder, and it is clear,

based on the requirements for a NSSI Disorder diagnosis, that D. Chapman does not have the

disorder, the jury would wonder what to make of the testimony and how to use it.  The testimony

would not further any fact of consequence in the case, and the jury would be left scratching their

heads wondering how to use this piece of evidence.  The testimony, accordingly, has little-to-no

probative value and would only serve to confuse the jury.  Rule 403, thus, calls for its exclusion,

because the danger of unfair prejudice -- caused by potential jury confusion -- substantially

outweighs the evidence's probative value.  See Fed. R. Evid. 403.  This analysis may be different

if there was some indication that D. Chapman engaged in self-injury more than once -- at least five times a year.  See NSSI Disorder at 2.  Multiple self-inflictions is not the case here, and the evidence suggests that D. Chapman has engaged in self-injury on only one occasion.  Because testimony concerning NSSI Disorder is not relevant in this case and because it would serve only to confuse the jury, the Court will prohibit Starr from testifying about NSSI Disorder.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

It appears that the term NSSI can refer to both self-harm and self-injury in general, and to NSSI Disorder.  The United States used the term "NSSI" to refer to both a specific disorder and to self-harm and self-injury in general.  In the Notice, the United States refers to NSSI in a manner that refers to self-injury in general by noting that "a variety  of injuries fall under" the category of NSSI.  See Notice ¶ 2, at 2.  In the Response, however, the United States notes that NSSI is listed as a disorder in the DSM V.  See Response at 6-7.  The United States also notes that the articles that it attached to the Response are a "small sampling of the evidence that NSSI is well recognized."  Response at 7.  These articles, however, refer to both self-harm and self-injury in general and to NSSI Disorder.  See U. Mass at 1-2 (discussing self-injury and self-harm); Mayo Clinic at 1-3 (same); Emergency Medicine at 1-5 (same); NSSI Disorder at 1-4 (discussing NSSI Disorder).  Some of the article titles from the Google Scholar search refer specifically to NSSI, while others refer only to self-injury.  See Scholar Search at 1-2.  Some of the articles that the United States attached to the Response address only self-injury and self-harm, and not NSSI or NSSI Disorder, see U. Mass at 1-2; Mayo Clinic at 1-3; Emergency Medicine at 1-5, while only one article addresses NSSI Disorder, see NSSI Disorder at 1-4.

At the September 12, 2014, hearing, the United States used the term NSSI to refer to the NSSI Disorder, and to refer to self-injury and self-harm in general.  The United States seemed to

imply that NSSI refers to self-injury and self-harm in general by noting that there is a wide range of NSSI, from Munchausen syndrome to lesser forms of self-injury. See Tr. at 19:21-20:14 (Mott). Yet, when the Court asked the United States about what Starr would testify if she could not testify about NSSI Disorder, the United States replied that Starr would testify only about self-harm and self-injury, rather than about NSSI Disorder. See Tr. at 34:25-18 (Mott, Court). This response seems to imply that the term "NSSI" refers to the disorder, and not self-harm and self-injury in general. At the hearing, the United States even used the term NSSI to refer to a specific disorder and to refer to self-harm in general in the same sentence, by stating that one episode of self-harm does not "fit the diagnosis of NSSI but" the self-harm is still self-harm "that falls under the umbrella . . . of NSSI." Tr. at 37:15-21 (Mott).

On its own research, the Court found a number of articles that define NSSI as "deliberate self-inflicted injury to the body that is performed without suicidal intent." Margaret S. Andover, Abigail Wren, Heather T. Schatten, Blair W. Morris, Marguierite Y. Shashoua, & Caroline S. Holman, Non-Suicidal Self-Injury, in Handbook of Adolescent Behavior Problems 631 (Thomas P. Gullota, Robert W. Plant, & Melanie A. Evans eds., 2015).[8] See Maria Zetterqvist, Lars-Gunnar Lundh, & Carl Göran Svedin, A Cross-Sectional Study of Adolescent Non-Suicidal Self-Injury: Support for a Specific Distress-Function Relationship, Child and Adolescent Psychiatry and Mental Health 8:23 (2014), available at, http://www.capmh.com/content/8/1/23 ("Non-suicidal self-injury (NSSI), defined as the deliberate destruction of body tissue without suicidal intent . . . ."). It appears that, based on the manner in which the parties used the term

---

[8]The Court has not reviewed the entire article from the Handbook of Adolescent Behavior Problems, but only the first two pages, which are available for free at link.springer.com. See Non-Suicidal Self-Injury, http://link.springer.com/chapter/10.1007/978-1-4899-7497-6_33. The authors define the term "NSSI" within these two pages. See Andover et al., supra at 631.

and based on these articles, NSSI may refer to the Disorder, or may refer to self-harm and self-injury in general.  Starr is prohibited from testifying about the NSSI Disorder, but as discussed below, she may still testify about NSSI, as long as she is discussing self-harm and self-injury in general.

## II.    STARR MAY TESTIFY ABOUT SELF-HARM AND SELF-INJURY.

Starr may testify about self-harm and self-injury in general.  Starr's testimony must both have a "'reliable basis in the knowledge and experience of'" her discipline, and must be "'relevant to the task at hand.'"  Bitler v. A.O. Smith Corp., 391 F.3d at 1120-21 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 592, 597).  Starr's testimony concerning self-harm and self-injury satisfies both requirements.  Starr is qualified to testify about self-harm and self-injury, and how it arises in the context of traumatic stress and domestic abuse.  Additionally, testimony about self-harm and self-injury may assist the jury in determining why D. Chapman scratched herself.   While L. Chapman argues that Starr's testimony bolsters D. Chapman's version of the facts, this bolstering is permissible because it is not bolstering the credibility of D. Chapman.  See United States v. Charley, 189 F.3d at 1264.

The United States has represented that Starr will testify to "the overall reasons why patients present self-harm injuries."  Notice ¶ 2, at 2.  Starr will testify that that self-harm "is often a coping mechanism to internal distress, albeit an unhealthy coping mechanism."  Notice ¶ 2, at 2.   Starr will also testify that self-harm has "been connected to patients with post-traumatic stress."  Notice ¶ 2, at 2.  The Court concludes that this testimony is sufficiently reliable and relevant to satisfy rule 702's requirements.

A.       STARR'S PROPOSED TESTIMONY IS RELIABLE.

As to the reliability of Starr's testimony, the Supreme Court has articulated a non-exclusive list of factors to consider, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The Court may also consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  These factors support the reliability of Starr's testimony.

The concept that victims of domestic abuse engage in self-injury as a coping mechanism was the subject of the study in the Emergency Medicine Journal article.  See Emergency Medicine at 1.  The study concluded that there was a correlation between domestic abuse and self-harm.  See Emergency Medicine at 4.  Additionally, the United States presented articles which note that self-injury is a coping mechanism for sadness, self-loathing, rage, stress, emotional pain, intense anger, and frustration.  See U. Mass. at 1; Mayo Clinic at 1.  While these two internet articles may not be peer-reviewed, they are at least indicative that the content of Starr's testimony has been tested and published, and L. Chapman has not presented any articles or evidence to suggest otherwise.[9]  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.

---

[9]The Court realizes that the United States identified Starr only nine days before trial, and

Starr's testimony that self-injury can be a coping mechanism and that it occurs in patients suffering from post-traumatic stress appears to be generally accepted in the medical and scientific community.   The University of Massachusetts article suggests that self-injury is a manner in which some people cope with sadness, self-loathing, emptiness, guilt, and rage.  See U. Mass. at 1.  The Mayo Clinic article, similarly, notes that self-injury is "an unhealthy way to cope with emotional pain, intense anger and frustration."  Mayo Clinic at 1.  Additionally, the Emergency Medical Journal article notes that domestic assault victims have a greater risk of self-harm than other emergency department patients.  See Emergency Medicine.  These articles, and Starr's proffered testimony, indicate that self-harm and self-injury are generally accepted as coping mechanisms of domestic abuse victims.   See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 595.  Additionally, Starr's conclusions are not based on an unfounded extrapolation of the data, were not made for the purpose of litigation, and do not arise from anecdotal evidence, but rather have been developed over the seventeen years that Starr worked with patients of acute trauma.  See Notice ¶ 1, at 1-2.  See also Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3.

The error rate of Starr's methodology does not give any weight one way or another. There is no indication of what the error rate might be.  The United States represents that Starr "will not testify that D.[ Chapman] suffered from NSSI before, during, or after the incident." Response at 9.  Instead, Starr will testify that self-injury is a normal coping mechanism for

---

that L. Chapman filed his Motion to exclude eight days before trial; the hearing was hearing was held two days later.   This schedule was compressed.   L. Chapman may not have had an opportunity to do research before the hearing.  At the hearing, the Court indicated to L. Chapman that if he presented his own expert and presented literature that contradicts Starr's testimony, the Court may exclude Starr's testimony altogether.  Tr. at 41:12-18 (Court).  L. Chapman never did. Here, on the record before the Court, L. Chapman has not countered certain assertions that Starr intends to make.

victims of domestic abuse and that this self-injury is consistent with what happened in this case. See Tr. at 20:8-19 (Mott).  Whether Starr considered alternatives also does not provide weight for or against reliability, as the United States has represented that Starr's testimony "cannot rule out that D.[ Chapman] did not maliciously create the scratches with the intent to inculpate [L.] Chapman."  Response at 9.  As noted, Starr will not conclude that D. Chapman engaged in self-harm or that she was subjected to domestic abuse, but instead will conclude that D. Chapman's actions are consistent with a domestic violence victim engaging in self-injury as a coping mechanism.  See Tr. at 20:8-19 (Mott).  Finally, there does not appear to be set standards to judge whether victims of domestic abuse will engage in self-injury.  The inapplicability of these factors does not affect the Court's determination, however, because, as the Supreme Court noted, each factor will not apply in every case.  See Kumho Tire Co. v. Carmichael, 526 U.S. at 150.

Based on these factors and Starr's experience in treating domestic violence victims, the Court concludes that Starr's testimony concerning domestic violence and self-injury is reliable.

**B.    STARR'S PROPOSED TESTIMONY IS RELEVANT.**

Starr's testimony that victims of domestic abuse engage in self-injury as a coping mechanism and that D. Chapman's actions are consistent with this phenomenon is relevant to this case.  To be relevant, Starr's testimony must "logically advance[] a material aspect of the case" and "have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2.  There is a material dispute why D. Chapman scratched herself, and Starr's testimony may be relevant in resolving this issue.

L. Chapman contends that D. Chapman attempted to inculpate him by scratching herself. See Motion ¶ 7, at 3.  Based on the proffer of Starr's testimony, the United States seems set to

argue that D. Chapman scratched herself as a coping mechanism to deal with the stress from the alleged assault.  See Tr. at 20:17-21:22 (Mott, Court).  The reasons why D. Chapman scratched herself may be enlightening as what happened on January 26, 2014, and as to who was the initial aggressor.  L. Chapman argues that Starr's testimony is not relevant, or that unfair prejudice outweighs the testimony's probative value, by arguing that Starr's testimony impermissibly bolsters the credibility of D. Chapman, see Motion ¶ 9, at 4-5, that Starr's testimony is contrary to the narrative that D. Chapman created through statements given to the police, see Tr. at 7:22-8:1 (Robert), and that Starr's testimony is too speculative, because she is merely testifying about NSSI and then leaving it to the jury to make the diagnosis, see Tr. at 29:11-30:8 (Robert, Court).

To bolstering credibility, L. Chapman argues that Starr's testimony will bolster D. Chapman's testimony why she scratched herself.  See Motion ¶ 9, at 5.  But D. Chapman does not have a story.  She does not know why she scratched herself.  See Tr. at 20:20-21:18 (Mott, Court).  She is not going to say it is NSSI Disorder, because she has never scratched herself before she suffered the alleged domestic violence.  Thus, Starr's testimony does not bolster D. Chapman's testimony; rather, it is an explanation of events to rebut L. Chapman's allegation that she scratched herself to manufacture incriminating evidence against him.  In any case, while the Tenth Circuit has held that the "credibility of witnesses is generally not an appropriate subject for expert testimony," United States v. Toledo, 985 F.2d at 1470, Starr's testimony does not fit into this category.  The United States has not indicated that Starr will testify that D. Chapman is telling the truth or that, because D. Chapman asserts that she was not the aggressor, she must not have been, cf. United States v. Charley, 189 F.3d at 1267 (holding that expert's testimony was inadmissible when she testified that two girls were sexually assaulted, because

they told her that they were assaulted); rather, Starr will testify that victims of traumatic experiences may engage in self-injury as a coping mechanism and that D. Chapman's conduct is consistent with this phenomenon, see Notice ¶ 2, at 2; Tr. at 20:17-19 (Mott).  Starr cannot make this conclusion based on statements that by D. Chapman made, because Starr has not examined D. Chapman.  See Tr. at 17:15-25 (Mott, Court).

While Starr's testimony may be consistent with D. Chapman's anticipated testimony, consistency does not constitute impermissible vouching.  Starr's testimony is similar to the testimony that the Tenth Circuit approved in United States v. Charley and that this Court approved on United States v. Harry.  In United States v. Charley, the expert witness testified that the girls' symptoms and conduct was consistent with those of sexual assault victims.  See United States v. Charley, 189 F.3d at 1263-64.  The girls both testified that the defendant had sexually assaulted them.  See United States v. Charley, 189 F.3d at 1258.  The Tenth Circuit held that this testimony was permissible expert testimony, see United States v. Charley, 189 F.3d at 1264-65, despite the dissent of the Honorable William J. Holloway, United States Circuit Judge for the Tenth Circuit, who argued that the testimony constituted impermissible vouching, see 189 F.3d at 1276 (Holloway, J., dissenting).  Similarly, in United States v. Harry, the Court allowed a SANE nurse to testify that a sexual assault victim's injuries were consistent with her version of events -- that the defendant raped her.  See 2014 WL 1949993, at *34.  The Court noted that the expert could not determine whether the sex was consensual or whether the defendant was the alleged abuser.  See United States v. Harry, 2014 WL 1949993, at *35.  The Court, however, excluded the testimony of another expert, who sought to testify that the victim's demeanor to during the sexual assault examine suggested that she was not assaulted, because the credibility of witnesses was not an appropriate subject for expert testimony.  See United States v. Harry,

2014 WL 1949993, at *36-38.  The Court reached a similar conclusion in United States v. Chaco.  See 801 F. Supp. 2d at 1216 (allowing a doctor to testify that a sexual assault examination was consistent with the conclusion that the victim had been sexually assaulted but prohibiting testimony that victim was actually sexually assaulted, because that conclusion was based on statements made by the victim).

In the same way, Starr's testimony is not impermissible vouching.  Starr will testify about self-injury, victims of traumatic experiences, and how this conduct is consistent with D. Chapman's actions.  See Notice ¶ 2, at 2; Tr. at 20:17-19 (Mott).  This testimony is permissible under United States v. Charley.  See 189 F.3d at 1264-65.  See also United States v. Chaco 801 F. Supp. 2d at 1216; United States v. Harry, 2014 WL 1949993, at *34-35.  Indeed, if expert witnesses were prohibited from testifying about facts that are consistent with or that support another witness' testimony, almost all expert testimony would be inadmissible.  A party will not likely call an expert witness if the expert's testimony does not bolster the party's case in some way.  And if the party presents a factual witness, who testifies to the party's version of events, the expert's testimony will likely support or be consistent with the factual witness' version of events.  Mere consistency or support is not, however, sufficient to constitute impermissible vouching.  Rather, an expert's testimony results in impermissible vouching if the expert testifies to the credibility of a factual witness, see United States v. Toledo, 985 F.2d at 1470, which is not the case here.

L. Chapman also argues that Starr's testimony is contrary to the narrative that D. Chapman created by telling the police that L. Chapman scratched her.  See Tr. at 7:22-8:1 (Robert).  This argument goes to the weight of the evidence and not its admissibility.  L. Chapman is free to argue that D. Chapman attempted to inculpate him, and, to support this

argument, he may confront D. Chapman on cross-examination with her statements that she made to the police -- subject to potential hearsay issues.  The United States, however, is free to argue that D. Chapman scratched herself to cope with the stress of the alleged assault.  Consistency with the United States' narrative, and contradiction with L. Chapman's, does not make Starr's testimony inadmissible.  See United States v. Caraway, 534 F.3d at 1301 ("Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case.")(quoting United States v. Curtis, 344 F.3d at 1067).  The United States has problems with its case, but those problems do not mean that it cannot call an expert to provide a reasonable explanation -- particularly when D. Chapman does not have an explanation for what she did.  It will be up to the jury to determine which narrative to believe.  The United States may introduce Starr's testimony to support its narrative just as L. Chapman may confront D. Chapman with her prior statements, and may present his own expert.  After the jury hears all of the evidence, it will decide which narrative to believe.

Concerning L. Chapman's final argument -- that the jury will be given information about self-injury and self-harm, and then have to make the diagnosis -- this testimony, and this request of the jury, is not inconsistent with ordinary expert testimony.  In United States v. Koruh, 210 F.3d 390, No. 99-2138 (10th Cir. Apr. 3, 2000)(unpublished),[10] the Tenth Circuit, in an

---

[10]United States v. Koruh is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

opinion that the Honorable H. Dale Cook, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation, wrote, and that Judges Kelly and Murphy joined, affirmed a district court's ruling to admit expert testimony on the conduct and symptoms of sexual assault victims.  See No. 99-2138, at *2, 4.  There, the expert did not testify about the facts of the case or about the particular victims, whom she had not examined, but rather testified about the characteristics that a sexual assault victim might exhibit.  See United States v. Koruh, No. 99-2138, at *2.  The Tenth Circuit noted that "[e]xpert testimony which addresses 'a class of victims generally,' and not the 'particular testimony of the child victim in the case,' is admissible."  No. 99-2138, at *2 (quoting United States v. Bighead, 128 F.3d 1329, 1331 (9th Cir. 1997)(holding that district court did not err in admitting expert testimony on the characteristics of child sexual abuse victims)).  The Tenth Circuit went on to hold that, under the rule 403 balancing test, the district court did not err in admitting the testimony.  See No. 99-2138, at *4.

In the same way that the expert in United States v. Koruh was permitted to testify about the characteristics of sexual assault victims, without examining the victim in the case, Starr may testify about victims of domestic abuse and self-injury, without examining D. Chapman in this case.  Starr's testimony may assist the jury in understanding the reasons why D. Chapman scratched herself, and providing this information to the jury, without actually diagnosing D. Chapman, will not create undue jury confusion.  A reasonable juror will be able to receive this information and use it in his or her determination of whether to believe the United States' or

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Koruh has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

L. Chapman's version of events, without being unreasonably confused on what to do with the testimony.

If Starr testifies that D. Chapman's behavior is consistent with that of a domestic abuse victim, Starr must clarify, as the United States has represented, that she cannot rule out that D. Chapman "maliciously create[d] the scratches with the intent to inculpate Chapman" or that Chapman created the scratches for any other reason.  Response at 9.  The United States has represented that Starr will testify that D. Chapman's actions are consistent with self-injury that occurs after a traumatic event, but that she will not be able testify to what occurred or why D. Chapman scratched herself.  See Response at 3, 9.  The Court will hold the United States to this representation.  If Starr testifies that D. Chapman's actions are consistent with that of a domestic abuse victim, Starr must clarify that there may be other explanations for the scratches and that she cannot opine to the true reason for the scratches.

The Jury will not be adrift in its task.  The credibility of the witness will inform the jury.  If the jury does not believe D. Chapman when she says that she does not know why she scratched herself, Starr's testimony becomes irrelevant.  Furthermore, if Starr went further, and made the decision for the jury, that would not make L. Chapman happy.  Also, expert testimony on ultimate issues is also problematic.  See  Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, at *18 (D.N.M. Aug. 25, 2009)(Browning, J.)(explaining what expert testimony on certain ultimate issues are prohibited by the Federal Rules of Evidence).  Constrained, Starr's testimony is admissible.

The Court concludes that Starr's testimony is relevant to the case and will assist the jury in its determination.  Additionally, L. Chapman's concerns of undue prejudice are insignificant

or inapplicable.  Starr's testimony is, thus, relevant, and unfair prejudice does not significantly outweigh the testimony's probative value.

**III.    THE COURT WILL DENY L. CHAPMAN'S MOTION WITHOUT PREJUDICE TO HIM RENEWING IT AFTER HE SECURES AN EXPERT AND HAS TIME TO RESEARCH THE RELEVANT SCIENTIFIC AND MEDICAL LITERATURE.**

The most troubling portion of Starr's testimony is that people who have never engaged in self-harm or self-injury can, after a traumatic event, engage in self-injury one time and then never again.  The facts, as the United States wants the jury to see them, are that D. Chapman never has cut or scratched herself before or after the event.  Thus, Starr's testimony that this isolated event is possible is knowledge that the jury is unlikely to hear without her expert opinion.

The Court's concerns are twofold.  First, Starr did not show up at the <u>Daubert</u> hearing and testify.  Thus, neither L. Chapman nor the Court was able to cross-examine her or question this proposed testimony.  Hence, the Court must rely on the United States' representations.  The Court will hold the United States to its representation, and, if Starr is not going to say what the United States says she will say, it should not put her on the stand at all.  To be precise, if Starr is not going to say that a person, who has never engaged in self-injury, but then has a traumatic event, that person may engage in self-injury but then never engage in self-injury again, then Starr should not testify.  If Starr is not going to say these exact words, she should not testify.  She has nothing relevant to say.

Second, the United States has represented that Starr will testify that she has seen patients in exactly D. Chapman's situation, <u>i.e.</u>, patients who have never engaged in self-injury, have a traumatic domestic violence incident, engage in self-injury, but never engage in self-injury again.  Again, if Starr is not going to say that, she should not take the stand.  The United States has not

presented any scientific or medical literature that says what she has seen, so if she has not seen what the United States says she has seen, the Court has no reliable basis for her testimony.

L. Chapman can also undermine Starr's testimony.  If his expert can show that there is no scientific or medical basis for Starr's opinion, the Court would be ready to reconsider allowing her testimony.  Also, if L. Chapman wants to present medical or scientific literature that says that Starr's proposed testimony is not accurate, the Court would be ready to reconsider.

The Court notes, however, that the parties' actions to date suggest to the Court that it has gotten the issue right.  While the United States has not presented any scientific literature to support the one-self-injury incident scenario, L. Chapman has retained an expert and his notice states:

> Mr. Chapman intends to call Elliot J. Rapoport, Ph.D., an expert in clinical psychology.  Dr. Rapoport is expected to testify that an expression of opinion by any expert, including the prosecution expert, as to any particular psychological reason for a one-time self-injury under the circumstances present in this case would be unfounded and speculative.  He will also testify to a variety of other possible psychological reasons for the infliction of self-injury as in this case, not to indicate that any of those possible reasons applies in this case, but to accurately inform the jury about the range of psychological possibilities that exist, beyond the one which has been posited by the prosecutor.

Notice of Intent to Offer Expert Testimony of Elliot J. Rapoport, Ph.D. ¶ 1, at 1, filed October 14, 2014 (Doc. 53)("Rapoport Notice").  This description of Dr. Rapoport's testimony is slightly ambiguous, particularly the sentence that Dr. Rapoport will "testify that an expression of opinion by any expert, . . . as to any particular psychological reason for a one-time self-injury under the circumstances present in this case would be unfounded and speculative."  Rapoport Notice ¶ 1, at 1.  This description seems to suggest that a one-time self-harm incident is possible, but that it would be "unfounded and speculative" to opine as to why the person engaged in the self-harm.

Rapoport Notice ¶ 1, at 1.[11]  This description suggests to the Court that L. Chapman talked to Dr. Rapoport and that he concluded the one-NSSI incident scenario happens and is possible. Rather than refuting Starr's narrow opinion, Dr. Rapoport is going to say that there are other possible explanations for D. Chapman's one-time self-injury.  In other words, Dr. Rapoport will do the same thing that Starr will do: present some scientific opinion, and then the jury will have to decide why D. Chapman did what she did.  In that sense, the expert testimony in this case is turning out to be rather typical: two experts squaring off, offering the jury different takes on the events.  Of course, all of this expert testimony becomes moot if the jury decides it does not believe D. Chapman when she says she does not know why she cut herself.

**IT IS ORDERED** that the Motion for <u>Daubert</u> Hearing and to Exclude Testimony Offered to Bolster Testimony from Another Witness, filed September 10, 2014 (Doc. 32), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

---

[11]On its own research, the Court found an article from Cognitive Therapy Research, which noted that some research has found that around 20% of people who engage in self-injury engage in only one incident of self harm during their lifetime.  <u>See</u> Anne C. Knorr, Abigail L. Jenkins, & Bradley T. Conner, <u>The Role of Sensation Seeking in Non-Suicidal Self-Injury</u>, 37 Cognitive Therapy & Res. 1276, 1277 (2013)("Additional research has found that 23.6-25.4% of individuals who self-injure engage in only one incident of self-harm during their lifetime.").  The article noted that other research concluded that around 80% of people who engage in self-injury do so in multiple incidents.  <u>See</u> Knorr et al., <u>supra</u> at 1277 ("Gratz (2001) found that approximately 83% of self-injuring individuals engage in more than one incident of NSSI."). The Court has not reviewed the entire article, but only the first two pages, which are available for free at link.springer.com.  <u>See</u> <u>The Role of Sensation Seeking in Non-Suicidal Self Injury</u>, http://link.springer.com/article/10.1007/s10608-013-9554-z.  From these two pages, however, it appears that research supports the notion that an individual may engage in self injury on only one occasion, and then never again in his or her lifetime.

*Counsel:*

Damon P. Martinez
  United States Attorney
William J. Pflugrath
Linda Mott
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Marc H. Robert
Kari Converse
   Assistant Federal Public Defenders
Albuquerque, New Mexico

*Attorneys for the Defendant*