IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                               No. CR 14-1065 JB

LESLIE CHAPMAN,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before Court on: (i) the United States' Motion to Compel Supplemental Expert Witness Notice and to Exclude Defense Expert From Offering Opinion as to "Unfounded or Speculative Evidence," filed October 22, 2014 (Doc. 57)("Motion to Compel"); and (ii) Mr. Chapman's Response to the Prosecution's Motion to Compel [Doc. 57], Renewal of Motion to Preclude Government's Expert [Doc. 32] and Request to Conduct Voir Dire Examination of Prosecution's Expert Prior to Testimony Before Jury, filed October 27, 2014 (Doc. 67)("Response"). The Court held a hearing on October 28, 2014. The primary issues are: (i) whether the Notice of Intent to Offer Expert Testimony of Elliot J. Rapoport, Ph.D. (Doc. 53)("Rapoport Notice"), sufficiently discloses the opinions that Elliot J. Rapoport, Ph.D., will give at trial; (ii) whether the Court should permit Defendant Leslie Chapman ("L. Chapman") to conduct a voir dire examination of Gail Starr, Plaintiff United States of America's expert, before trial; and (iii) whether the Court should reconsider its ruling on the Motion for <u>Daubert</u> Hearing and to Exclude Testimony Offered to Bolster Testimony from Another Witness, filed September 10, 2014 (Doc. 32)("Motion to Exclude"), and exclude Starr's testimony. The Rapoport Notice is insufficient, so the Court will order L. Chapman to disclose

to Plaintiff United States of America the specific psychological conditions about which Dr. Rapoport will testify.  At the October 28, 2014, hearing, the United States provided L. Chapman with the articles on which Starr relied, potentially alleviating L. Chapman's need for voir dire.  The Court will, thus, deny L. Chapman's requested voir dire without prejudice to renew after he reviews the articles.  Finally, L. Chapman has not presented any new arguments, evidence, or law to cause the Court to question its ruling on the Motion to Exclude, and the Court remains persuaded that the ruling is appropriate.  Consequently, the Court will not exclude Starr's testimony.

## FACTUAL BACKGROUND

The Amended Information alleges that L. Chapman, on or about January 26, 2014, "unlawfully touch[ed] and appl[ied] force to the person of a household member[, his wife -- Dana Chapman --] with intent to injure" her at the "Veterans Affairs Medical Center in Bernalillo County, in the District of New Mexico."  Amended Information at 1, filed April 4, 2014 (Doc. 12)("Amended Information").  In doing the "unlawful touch[ing]," L. Chapman allegedly caused D. Chapman "temporary disfigurement and temporary loss and impairment of the function of" a "member of [her] body."  Amended Information at 1.  The Amended Information also alleges that L. Chapman prevented, obstructed, and delayed the "sending, transmitting, conveying and delivering" of a "message, communication and report by and through telephone."  Amended Information at 1-2.  The Amended Information further alleges that L. Chapman knowingly possessed and carried a firearm "on the property of the Veterans Affairs Medical Center, Albuquerque, with no official purpose."  Amended Information at 1.

According to L. Chapman, immediately after the incident, D. Chapman told a Veterans Affairs officer that L. Chapman scratched her neck and chest.  See Response ¶ 6, at 3.

L. Chapman contends that D. Chapman repeated these accusations in a handwritten statement that she made a few hours after the incident and that she posed for photographs that law enforcement personnel took to document her injuries.  See Response ¶ 6, at 3.  D. Chapman later conceded that she inflicted the scratches on herself.  See Response ¶ 8, at 3-4.

## PROCEDURAL BACKGROUND

As of June 30, 2014, trial was set for September 18, 2014.  See Order Granting Continuance of Trial Setting and Setting a Definite Date for Trial at 2, filed June 30, 2014 (Doc. 28).  Nine days before trial was to begin, the United State filed a notice of its intent to call Starr as an expert witness.  See Notice of Intent to Offer Expert Testimony ¶ 1, at 1, filed September 9, 2014 (Doc. 31)("Starr Notice").  In the Starr Notice, the United States asserts that Starr will "discuss the overall reasons why patients present with self-harm injuries."  Starr Notice ¶ 2, at 2.  The United States contends that Starr's testimony is relevant, because photographs show that D. Chapman received scratches after the alleged assault, and that Starr's testimony "is necessary to explain the prevalence of such self-injurious conduct in traumatic situations . . . and to prevent confusion by the jury over the proper relevance of the abrasions."  Starr Notice ¶ 3, at 3.

The next day, L. Chapman moved to exclude Starr's testimony.  See Motion to Exclude at 1.  Two days later, on September 12, 2014, the Court held a hearing.  At the hearing, the Court ruled that it would grant the Motion to Exclude in part and deny it in part.  See Transcript of Hearing at 39:11-41:4 (taken Sept. 12, 2014)(Court)("Sept. 12, 2014, Tr.").[1]  In light of its ruling, and the close proximity to trial, L. Chapman was "[u]nprepared for trial."  Sept. 12, 2014,

---

[1]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may have slightly different page and/or line numbers.

Tr. at 41:6 (Robert).  Both parties agreed to a continuance, and the Court reset the trial date.  <u>See</u>

Sept. 12, 2014, Tr. at 41:7-11 (Mott, Court); <u>id.</u> at 42:10-24 (Robert, Mott, Court).

On October 14, 2014, L. Chapman filed the Rapoport Notice.  <u>See</u> Rapoport Notice at 1.

In the Notice, L. Chapman states that, at trial, he intends to call Dr. Rapoport as an expert

witness.  <u>See</u> Rapoport Notice at 1.  L. Chapman asserts that Dr. Rapoport is an expert in clinical

psychology and that he is expected to testify that any expert opinion that gives a "particular

psychological reason for a one-time self-injury under the circumstances in this case would be

unfounded and speculative."  Rapoport Notice at 1.  L. Chapman states that Dr. Rapoport "will

also testify to a variety of other possible psychological reasons for the infliction of self-injury as

in this case . . . to accurately inform the jury about the range of psychological possibilities that

exist" outside the single possibility that victims of traumatic experiences self-injure themselves.

Rapoport Notice at 1.

On October 22, 2014, the United States filed the Motion to Compel.  <u>See</u> Motion to

Compel at 1.  The United States contends that, on October 21, 2014, it requested that

L. Chapman supplement the Rapoport Notice to set forth Dr. Rapoport's opinions and the basis

for his opinions, but that L. Chapman has not provided it with the information.  <u>See</u> Motion to

Compel at 1-2.  The United States asserts that the Rapoport Notice is too vague to satisfy rule

16(a)(1)(G) of the Federal Rules of Criminal Procedure and rule 702 of the Federal Rules of

Evidence.  <u>See</u> Motion to Compel at 2.  The United States argues that, without an adequate

summary of Dr. Rapoport's testimony, it cannot effectively cross-examine him or prepare for

trial.  <u>See</u> Motion to Compel at 2 (citing <u>United States v. Michel-Diaz</u>, 205 F. Supp. 2d 1155,

1157 (D. Mont. 2002)).  It contends that the Rapoport Notice states that Dr. Rapoport will testify

about possible psychological reasons for self-injury without stating what those reasons are or what the basis for his opinions concerning those reasons are.  See Motion to Compel at 2.

The United States argues that, without a report outlining Dr. Rapoport's testimony, it will have to conduct an extensive voir dire during trial, which will waste the Court's time and resources.  See Motion to Compel at 2-3.  The United States asserts that L. Chapman does not state the basis for Dr. Rapoport's opinion that Starr's testimony is unfounded and speculative.  See Motion to Compel at 3-4 (citing First Data Corp. v. Konya, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)).  The United States contends that, because the Rapoport Notice lacks sufficient information, the Court cannot adequately determine if Dr. Rapoport's testimony is reliable.  See Motion to Compel at 4.  It, thus, asks the Court to compel L. Chapman to supplement the Rapoport Notice and to exclude Dr. Rapoport's testimony that Starr's testimony is unfounded and speculative, because his own testimony is unfounded and speculative.  See Motion to Compel at 4.

L. Chapman responded to the Motion to Compel on October 27, 2014.  See Response at 1.  He uses the Response for three purposes: (i) to respond to the Motion to Compel; (ii) to renew the Motion to Exclude; and (iii) to request the Court permit him to conduct voir dire of Starr before trial.  See Response at 1.  L. Chapman contends that he retained Dr. Rapoport to assist him and to possibly testify at trial.  See Response ¶ 2, at 2.  He asserts that, on October 22, 2014, he received a letter from Dr. Rapoport stating, among other things, that D. Chapman's self-injury could be the result of at least five different psychological problems and that there is not enough information to properly diagnose her.  See Response ¶ 3, at 2; Letter from Elliot J. Rapoport, Ph.D., Licensed Clinical Psychologist, to Marc Robert, Esq. at 1-2 (dated Oct. 13, 2014), filed October 27, 2014 (Doc. 67-1)("Rapoport Letter").

- 5 -

L. Chapman repeats the facts and procedural history of the case -- that, after the incident, D. Chapman blamed L. Chapman for scratches on her chest, but it later came to light that D. Chapman scratched herself.  See Response ¶¶ 6-8, at 3-4.  He contends that Starr's testimony is too speculative, which is a problem that the Rapoport Letter, and the lack of any treatment or evaluation of D. Chapman, highlights.  See Response ¶ 9, at 4.  L. Chapman argues that, because there are a number of psychological reasons why D. Chapman could have scratched herself, there is no reason for concluding that D. Chapman suffers from any one of those reasons, which is why Dr. Rapoport's testimony is necessary to give the jury a complete picture of the psychological reasons for D. Chapman's self-injury.  See Response ¶ 10, at 4-5.  He contends that merely because Starr -- who works with traumatized women -- sees a correlation between D. Chapman's actions and her own experiences does not mean her testimony will assist the jury. See Response ¶ 11, at 5.  L. Chapman maintains that, because Starr cannot properly diagnose D. Chapman, and because Starr can only testify to her anecdotal experiences with abuse victims, her testimony will confuse the jury.  See Response ¶¶ 12-14, at 6.  He states that, "[a]s he argued before" -- likely referring to the Motion to Exclude -- Starr's testimony should also be excluded under rule 403 of the Federal Rules of Evidence.  Response ¶ 16, at 7.  L. Chapman asserts that, because Starr did not prepare a report or testify at the September 12, 2014, hearing, he should have an opportunity to conduct a voir dire examination of Starr so that the Court can make a final determination on the admissibility of her testimony.  See Response ¶ 17, at 7.  Later, on the same day that L. Chapman filed the Response, the Court issued the Memorandum Opinion and Order, filed October, 27, 2014 (Doc. 70)("MOO"), explaining its rationale for granting in part and denying in part the Motion to Exclude.  See MOO at 1.

The Court held a hearing on October 28, 2014.  See Transcript of Hearing (taken Oct. 28, 2014)("Oct. 28, 2014, Tr.").[2]  The Court asked the United States if the Rapoport Letter was a sufficient disclosure, and the United States said that letter was partially sufficient, but that it is insufficient insofar as it does not say whether Dr. Rapoport will testify.  See Oct. 28, 2014, Tr. at 35:16-25 (Mott, Court).  L. Chapman stated that he is planning on calling Dr. Rapoport to testify and that he would testify that there are a number of psychological conditions, other than trauma, that could have caused D. Chapman to self-injure.  See Oct. 28, 2014, Tr. at 36:2-20. (Robert, Court).  The United States contended that it did not know about what other psychological conditions Dr. Rapoport may testify, which is information that it needs to know to properly prepare for cross examination.  See Oct. 28, 2014, Tr. at 36:22-6 (Mott).  L. Chapman maintained that, because no one examined D. Chapman, neither Starr nor Dr. Rapoport can say can say why D. Chapman injured herself.  See Oct. 28, 2014, Tr. at 37:12-38:8.  The Court told L. Chapman to list the reasons that Dr. Rapoport will testify may have caused D. Chapman to self-injure, and the United States said that the list should be sufficient.  See Oct. 28, 2014, Tr. at 38:9-20 (Mott, Robert, Court).

Turning to the Response, L. Chapman contended that, in the MOO, the Court laid out the concerns it had with Starr's testimony and noted that the United States represented that it would provide literature on self-harm, but had not done so.  See Oct. 28, 2014, Tr. at 43:22-44:17 (Converse).  The United States noted that it had three articles on self-injury, which it provided to L. Chapman and to the Court, and that, in the MOO, the Court also identified an article that suggested that self-injury can be a one-time event.  See Oct. 28, 2014, Tr. at 45:1-46:6 (Mott, Court).  See also Self-Harm: Key Facts, Royal College of Psychiatrists; Self-Harm: The NICE

_____

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

<u>Guideline on Longer-Term Management</u>, The National Collaborating Centre for Mental Health (2012); <u>Self-Harm, Suicide and Risk: Helping People Who Self-Harm -- Final Report of a Working Group</u>, Royal College of Psychiatrists (June 2010).  The Court asked the United States if those three articles were all on which Starr would rely, and the United States replied that she may rely on a few more, but that Starr did not provide it with copies of the other articles.  <u>See</u> Oct. 28, 2014, Tr. at 46:5-10 (Mott, Court).  The Court asked the United States if it would provide L. Chapman with every article on which Starr would rely, and it said that it would.  <u>See</u> Oct. 28, 2014, Tr. at 46:18-21 (Mott, Court).

The Court asked L. Chapman whether, after receiving copies of every article on which Starr would rely, he needed any more information, and he said that he may still need to conduct voir dire of Starr before trial.  <u>See</u> Oct. 28, 2014, Tr. at 46:22-25 (Converse, Court).  The Court asked why, after receiving the articles, L. Chapman needed to conduct voir dire, and he asserted that he had not yet read the articles to see what they say about the Diagnostic and Statistical Manual of Mental Disorders IV and self-injuries in a situation that is similar to the case.  <u>See</u> Oct. 28, 2014, Tr. at 47:14-22 (Converse, Court).  The Court said that it would deny L. Chapman's voir dire request at the time, but that, after L. Chapman reviewed the articles, if he still has questions, he can renew his request.  <u>See</u> Oct. 28, 2014, Tr. at 49:14-19 (Court).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>[, 509 U.S. 579 (1993)], trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide."  <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).  "The Court now must not only decide whether the

expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether

the opinion testimony is the product of a reliable methodology." United States v.

Gutierrez-Castro, 805 F. Supp. 2d at 1224.   "Daubert v. Merrell Dow Pharmaceuticals, Inc.

requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is

sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

### 1.     Rule 702.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> **(b)**  the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and
> methods; and
>
> **(d)** the expert has reliably applied the principles and methods
> to the facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is

proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d

1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the

large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to

land values.").   An expert is "required to possess such skill, experience or knowledge in that

particular field as to make it appear that his opinion would rest on substantial foundation and

would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005) (Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

## 2. The Standard in Daubert v. Merrell Dow Pharmaceuticals, Inc.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. CIV 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error

- 10 -

rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509 U.S. at 592 . . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id.  (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

397 F.3d 878, 883-84 (10th Cir. 2005)(footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case . . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591).  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v.

Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharmaceuticals, Inc., to non-scientific expert testimony.  See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharmaceuticals, Inc. will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the Court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted).  The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206 (citation omitted). The United States Court of Appeals for the Ninth Circuit

noted in Claar v. Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503 (citation omitted).

Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th

Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis. At worst, the link has been tested and found

to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific

presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo.

1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

3.     **Necessity of Evaluating an Issue Under Daubert v. Merrell Dow Pharmaceuticals, Inc.**

The restrictions in Daubert v. Merrell Dow Pharmaceuticals, Inc. apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[3] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of

_____

[3]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.   "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ."   Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).   "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."   Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.   Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.   See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

### 4. Expert Testimony Bolstering Other Witnesses' Credibility.

"The credibility of witnesses is generally not an appropriate subject for expert testimony."   United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993).   See United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1213 (D.N.M. 2011)(Browning, J.)(excluding expert testimony on whether defendant's confession was credible).

> There are several reasons for the prohibition against expert testimony on other witness' credibility.  Such testimony: (1) "usurps a critical function of the jury"; (2) "is not helpful to the jury, which can make its own determination of credibility"; and (3) when provided by "impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury."

United States v. Hill, 749 F.3d 1250, 1258 (10th Cir. 2014)(quoting United States v. Toledo, 985 F.2d at 1470). The bar on credibility-bolstering expert testimony is grounded in a number of evidentiary rules. See United States v. Charley, 189 F.3d 1251, 1267 n.21 (10th Cir. 1999)(en banc). Expert testimony that vouches for the credibility of other witnesses lacks "relevance [under rule 401] and would not 'assist the trier of fact as required by Rule 702.'" United States v. Adams, 271 F.3d 1236, 1246 (10th Cir. 2001)(quoting United States v. Charley, 189 F.3d at 1267). See United States v. Harry, No. CR 10-1915 JB, 2014 WL 1949993, at *38 (D.N.M. May 5, 2014)(Browning, J.)(concluding that expert's testimony was not relevant if expert testified that witness' demeanor suggested that the witness was not subjected to a sexual assault, because the testimony impermissibly went to the witness' credibility).

> Courts have also held that testimony which vouches for the credibility of a witness violates other evidentiary rules, such as Rule 608(a)(1) or Rule 403. Some courts have held that, although Rule 608(a)(1) "permits testimony concerning a witness's general character or reputation for truthfulness," it "prohibits any testimony as to a witness's truthfulness on a particular occasion." State v. Rimmasch, 775 P.2d 388, 391 (Utah 1989)(construing Utah R. Evid. 608); see also United States v. Azure, 801 F.2d 336, 341 (8th Cir. 1986); State v. Wood, 194 W. Va. 525, 460 S.E. 2d 771, 778 (W. Va. 1995)(construing W. Va. R. Evid. 608); People v. Koon, 713 P.2d 410, 412 (Colo. Ct. App. 1985)(construing Colo. R. Evid. 608). And at least one court has held, in a sexual abuse case, that testimony that bolsters the credibility of the complaining witness violates Rule 403's balancing test. United States v. Funds Held in the Name or for the Benefit of John Hugh Wetterer, 991 F. Supp. 112, 120-21 (E.D.N.Y. 1998).

United States v. Charley, 189 F.3d at 1267 n.21. See United States v. Benally, 541 F.3d 990, 995 (10th Cir. 2008)(affirming district court's exclusion of vouching testimony under rule 403's balancing test). The bar on bolstering a witness' testimony only extends to expert testimony concerning the witness' credibility and not to expert testimony that is consistent with another witness' testimony. See United States v. Charley, 189 F.3d at 1264. In United States v. Charley, the Tenth Circuit held, en banc, that the district court did not err in permitting an expert witness

to testify that the actions and symptoms of two girls were consistent with those of a sexual assault victim.  See 189 F.3d at 1264.  The expert's testimony was consistent with the two girls' testimony that they had been sexually assaulted.  See 189 F.3d at 1258.  The Tenth Circuit held, however, that the district court erred in permitting a psychiatrist to testify that he believed the girls were sexually assaulted, based on statements the girls made to the psychiatrist, because the testimony "was essentially vouching for [the girls'] truthfulness."  189 F.3d at 1267.

In United States v. Chaco, 801 F. Supp. 2d 1200 (D.N.M. 2011)(Browning, J.), the Court permitted a doctor to testify that an examination of a sexual assault victim did not show any signs of sexual assault but that the majority of physical examinations on sexually assaulted prepubescent girls result in normal findings.  See 801 F. Supp. 2d at 1216.  The Court permitted the doctor to testify that the examination, which resulted in no evidence of sexual abuse, was still consistent with the victim being sexually abused.  See 801 F. Supp. 2d at 1216.  The Court excluded, however, testimony from the doctor that the victim had been sexually assaulted, because the doctor only knew that the victim was sexually assaulted based on statements that the victim made to the doctor.  See 801 F. Supp. 2d at 1216.  The Court reasoned that permitting the doctor to testify that the victim had been sexually assaulted would serve to impermissibly vouch for the witness' credibility.  See 801 F. Supp. 2d at 1216 (citing United States v. Velarde, 214 F.3d 1204, 1211 n.6 (10th Cir. 2000)).  The Court concluded, however, that the doctor's testimony that the examination results were consistent with that of a sexual assault victim was based on the doctor's knowledge and experience, and was, thus, permissible expert testimony.  See United States v. Chaco, 801 F. Supp. 2d at 1216.

## LAW REGARDING EXPERT TESTIMONY BY LAW ENFORCEMENT OFFICERS

"[P]olice officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld,'" United States v. Kamahele, 748 F.3d 984, 998 (10th Cir. 2014)(alteration in United States v. Kamahele but not in quoted source) (citation omitted), and "because it is likely to assist the trier of fact to understand an otherwise unfamiliar enterprise," United States v. Wilson, 276 F. App'x 859, 861 (10th Cir. 2008) (unpublished).[4]  See United States v. Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)("This Court has repeatedly held that in narcotics cases, expert testimony can assist the jury in understanding transactions and terminology."  (citing United States v. Garcia, 994 F.2d 1499 (10th Cir. 1993); United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992); United States v. McDonald, 933 F.2d 1519, 1522-23 (10th Cir. 1991); Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988))). The Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology."  United States v. Walker, 179 F. App'x 503, 507 (10th Cir. 2006)(unpublished)(quoting United States v. Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)).  "This rule is based on the Tenth Circuit's

---

[4]United States v. Wilson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Wilson, United States v. Walker, 179 F. App'x 503 (10th Cir. 2006) (unpublished), and United States v. Mundy, 97 F. App'x 844 (10th Cir. 2004)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

- 18 -

recognition that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade 'are not subjects with which most jurors are familiar.'" United States v. Hernandez-Mejia, No. CR 05-0469 JB, 2007 WL 2219411, at *4 (D.N.M. Apr. 30, 2007)(Browning, J.)(quoting United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991)). Other Circuits are in accord. See United States v. Martinez, 476 F.3d 961, 967 (D.C. Cir. 2007)("Expert testimony about the methods of drug organizations is common in drug cases."); United States v. Robles-Rosas, 27 F. App'x 897, 899 (9th Cir. 2001) (unpublished)(holding that the district court did not abuse its discretion in permitting testimony regarding the modus operandi of drug organizations); United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994)("[T]estimony on the modus operandi of criminals 'is commonly admitted,' particularly regarding the methods of drug dealers.").   For example, in cases involving possession with intent to distribute, the Tenth Circuit has held that "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue." United States v. Mundy, 97 F. App'x 844, 846 (10th Cir. 2004) (unpublished).  The Tenth Circuit has also recognized that, when a defendant denies awareness, the value of drugs found is relevant to the issue of a defendant's knowledge of the presence of the drugs within the vehicle. See United States v. Rodriguez, 192 F.3d 946, 949 (10th Cir. 1999)(citing United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986)).

Although early cases dealing with this genre of expert testimony articulated the standard of admissibility as being whether the expert testimony is "necessary" to achieve jury understanding, United States v. Robinson, 978 F.2d 1554, 1563 (10th Cir. 1992)("[G]ang-related items may necessitate the appearance of an expert witness if the jury could not understand the significance of possession of these items."  (emphasis added)(citation omitted)); id. at 1564-65

("[T]he expertise of this particular witness was <u>necessary</u>. . . .  The average juror <u>would</u> fail to recognize the 'significance of this evidence without the particular background knowledge' of gangs and the philosophy of gang membership. 'Without [the expert testimony], the basic evidence <u>would</u> leave a juror puzzled.'"  (emphases added)(quoting <u>United States v. McDonald</u>, 933 F.2d at 1522)), more recent cases -- perhaps as a result of the broader liberalization of expert testimony that accompanying the replacement of the <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923), standard with the <u>Daubert</u>, standard[5] -- articulate the standard as being whether the expert testimony "will <u>assist</u> the trier of fact," <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117, 1122 (10th Cir. 2006)(emphasis added), or whether it will be "helpful to the jury," <u>United States v. Kamahele</u>, 748 F.3d at 997.

There are special concerns attendant to law enforcement expert testimony.  The Court will first describe <u>United States v. Medina-Copete</u>, 757 F.3d 1092 (10th Cir. 2014)("<u>Medina-Copete</u>"), which appears to be the sole case from the Tenth Circuit -- which has generally broadly approved expert testimony by law enforcement officers -- reversing a district court for allowing such testimony.  Second, the Court will describe the special dangers of expert testimony by law enforcement officers as other Circuits, particularly the United States Court of Appeals for the Second Circuit, have outlined them.

1.    **<u>Medina-Copete</u> <u>and Tools of the Trade</u>.**

It is noteworthy that the Tenth Circuit routinely identifies so-called tools of the drug trade -- such as razor blades, pagers and beepers, pistols, and food stamps -- as being particularly

---

[5]Rule 702 now codifies the standard that <u>Daubert</u> first articulated: "[T]he expert's scientific, technical, or other specialized knowledge [is admissible if it] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The rule's requirement that the testimony "help" the jury is more liberal than the Tenth Circuit's pre-<u>Daubert</u> necessity standard.

appropriate subjects of law enforcement expert testimony, see, e.g., United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000); United States v. McDonald, 933 F.2d at 1522, but law enforcement expert testimony is by no means limited to tools of the trade.  The Tenth Circuit has upheld law enforcement expert testimony describing drug-dilution practices and street names for drug weights, see United States v. Quintana, 70 F.3d at 1171, stating that the defendant fits the "profile" of someone who commits the crime with which the defendant is charged, United States v. Becker, 230 F.3d at 1231, and explaining general procedures followed at drug transactions, such as that "outsiders [are] not . . . allowed to count and handle money," United States v. Wilson, 276 F. App'x at 861.  "Tools of the trade may necessitate the appearance of an expert witness if the jury could not understand the significance of the possession of those items." United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000).  The Tenth Circuit has held that it was appropriate for the government to present evidence regarding "typical indicia of drug trafficking activity" in a case where the government sought "to identify for the jury common red flags suggestive of an illicit pharmaceutical operation."  United States v. Lovern, 590 F.3d 1095, 1102 (10th Cir. 2009).  The Tenth Circuit has "upheld the admission of expert testimony detailing the significance of 'a drug dealer's tools of trade: a single-edge razor blade, a pager or beeper, and a loaded pistol.'"  United States v. Becker, 230 F.3d at 1231 (alteration in original). The Tenth Circuit has also upheld "the admission of expert testimony to 'explain[] the meaning of the physical evidence' officers 'found at the arrest scene . . . where the narcotics were confiscated."  United States v. Becker, 230 F.3d at 1231.  The Tenth Circuit found it permissible for an officer to testify "about the common features of drug transactions to assist the jury in understanding the nature of the drug business," including "that most drug organizations are closed and secretive and that it would be unusual for a person who was not otherwise involved in

the operation to be present during the transaction." United States v. Wilson, 276 F. App'x at 860-61. The United States Court of Appeals for the Fourth Circuit has recognized that a person may properly be qualified as an expert "in the field of investigative drug trafficking" in a given geographical area. United States v. Wilson, 484 F.3d 267, 273 (4th Cir. 2007) (Williams, J., joined by Niemeyer & Gregory, JJ.).

In most of the Tenth Circuit's cases, there appears to be no analytical distinction between "tools of the trade" testimony and other law enforcement expert testimony -- the former is simply a prominent genus of the latter. That said, the Court can find only one case in which the Tenth Circuit held that a district court abused its discretion by permitting law enforcement expert testimony -- Medina-Copete -- and that case reversed the Court at least in part on the basis that the subject about which the law enforcement expert witness testified was not a tool of the trade. Medina-Copete appears to be not only the sole Tenth Circuit case reversing a district court for allowing law enforcement expert testimony, but the only case even holding that a district court abused its discretion in admitting such testimony.[6] In that case, the Tenth Circuit reversed the Court's decision to allow an expert witness -- the United States Marshal for the Western District of Texas -- to testify that a prayer card recovered from the defendants suggested their involvement in the drug trade. See Medina-Copete, 757 F.3d at 1099. The prayer card venerated Santa Muerte, a figure whom the Roman Catholic Church does not recognize as a Saint and who is widely referred to -- by the Marshal and in popular culture[7] -- as a "narco saint." 757 F.3d

---

[6] One could speculate that the wrongful admission of such testimony -- which, by its nature, tends to consist largely of background information -- would be particularly amenable to forgiveness by way of the harmless-error doctrine.

[7] In the critically acclaimed television show Breaking Bad -- filmed and set, incidentally, in Albuquerque -- Santa Muerte is featured regularly. The cold opening of one episode depicts two of the series' more memorable villains crawling long distances on their bellies to reach a

at 1101.  The case is an unusual one, in which the Tenth Circuit, for the first time, appeared to suggest that tools-of-the-trade testimony is analytically distinct from other expert testimony.  See Medina-Copete, 757 F.3d at 1102-03.  Alternatively, the Tenth Circuit may have simply been saying that a prayer card is not a tool of the trade, while implicitly conceding that tools of the trade often support expert testimony.  Either way, while the Court had ruled that Santa Muerte's association with the drug trade -- the pseudo-saint is widely popular among the drug cartels, but plays virtually no role in law-abiding citizens' lives[8] -- was a worthy topic of expert testimony, the Tenth Circuit wanted something more:

---

shrine to the narco saint and, upon arrival, posting up a hand-drawn picture of an individual whom they hope to murder.  See Breaking Bad: No Mas (AMC television broadcast Mar. 21, 2010).  Now, narco saints are so well known that, after the Tenth Circuit issued Medina-Copete, the Honorable James A. Parker, United States District Judge for the District of New Mexico, simply allows arresting officers to testify about anything they find on the arrestee that bears the saint's image, and -- without permitting expert testimony about the saint -- allows the jury to draw its own conclusions.

[8]To be clear, Santa Muerte has nothing to do with Dia de los Muertos, a culturally significant and commonly celebrated holiday in Mexico and the American Southwest.  See Santa Muerte, Wikipedia.org, https://en.wikipedia.org/wiki/Santa_Muerte (last visited July 2, 2015).  Reverence of Santa Muerte is well outside the mainstream and is practiced almost exclusively by marginalized populations, including the criminal underworld.  See New God in Town, Time (Oct. 16, 2007)("The country's Catholic church has deemed Santa Muerte's followers devil-worshiping cultists.").

While reverence for Santa Muerte is almost nonexistent among mainstream, law-abiding citizens, it is not reserved only for the drug cartels.  Petty and non-violent criminals not associated with the drug trade often revere her, and she "is also seen as a protector of homosexual, bisexual, and transgender communities in Mexico, since many are considered to be outcast from society."  Santa Muerte, Wikipedia.org (last visited July 2, 2015).  That Santa Muerte is not associated solely with the drug cartels obviously weakens the circumstantial inference that someone like the defendants in Medina-Copete -- who were found in a vehicle that contained a large quantity of well-hidden drugs and a Santa Muerte prayer card in their hands -- is not a blind mule, i.e., a patsy who drives a vehicle that he or she does not know contains hidden drugs.  On the other hand, the Tenth Circuit did not hold that the prayer card itself was inadmissible -- just that expert testimony explaining the card's significance is inadmissible.  The Tenth Circuit's holding may, perversely, be to the detriment of future Santa Muerte-venerating defendants.  In the minds of many law-abiding Americans -- like the ones who serve on federal juries -- Santa Muerte is specifically linked to the Mexican drug cartels.  If

In assessing Almonte's qualifications, the district court relied on familiar precedent holding that "a drug dealer's tools of the trade" are an appropriate subject for expert testimony.  The district court acknowledged that "Almonte's proposed testimony is somewhat different from a typical case where a law enforcement officer seeks to testify on tools of the drug trade," but it nonetheless concluded that Almonte's testimony could be helpful to the jury, in part because "[d]rawing the connection between a religious icon and drug trafficking is not a straightforward matter."  On appeal, the government asserts that "[t]he Santa Muerte evidence related solely to the tools of the drug traffickers' trade."

Further inquiry into the analogy of religious veneration to "tools of the trade" would have been appropriate.  In <u>McDonald</u>, the tools of the trade we listed included "a single-edge razor blade, a pager or beeper, and a loaded pistol . . . [,] $990 cash and $20 in food stamps."  We explained that "the razor blade is at least circumstantial evidence suggesting Defendant possessed the means to cut the rock cocaine and thus intended to distribute."  We also explained how expert testimony with respect to the money and food stamps was useful to the jury: "Without understanding the drug trade is a cash-and-carry business, and that both cash and food stamps are the medium of exchange in a drug transaction, the basic evidence would leave a juror puzzled."  In <u>United States v. Robinson</u>, we discussed the relationship between tools of the trade and physical evidence indicating gang membership.  978 F.2d at 1563 (stating that gang-related items were "similar to" tools of the trade).  Our decision in <u>Robinson</u> affirmed the district court's decision to permit an expert to testify about gang affiliation, holding that "associational evidence may be directly relevant on . . . conspiracy," and noting "the uncontroverted evidence that the main purpose of the Crips was to traffic in crack cocaine."

Missing from the district court's discussion of Almonte's qualifications is any discussion of how his Santa Muerte testimony could legitimately connect Medina's prayer to drug trafficking.  There is no evidence that Santa Muerte iconography is "associational," nor was there any allegation that the "main purpose" of Santa Muerte veneration "was to traffic in" narcotics.  Almonte testified that there may be "millions" of followers of Santa Muerte, but he proffered no manner of distinguishing individuals who pray to Santa Muerte for illicit purposes from everyone else.  His data comes from his work as a narcotics detective and his compilation of "several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity."  Mere observation that a correlation exists

---

the United States shows a Santa Muerte prayer card to the jury without accompanying it with expert testimony explaining its significance, and if even one juror out of twelve has seen <u>Breaking Bad</u> -- highly likely here in Albuquerque -- then the jury is likely to conclude that the defendant is in the drug trade, without considering the valid alternative possibilities that the defendant could merely be a (less culpable) petty criminal or a (completely innocent) homosexual or bisexual person.  <u>See</u> <u>supra</u> note 7.

-- especially when the observer is a law enforcement officer likely to encounter a biased sample -- does not meaningfully assist the jury in determining guilt or innocence.

We are also perplexed by the government's argument that Santa Muerte veneration is a tool of the drug trade. "[T]ools of the trade" are "means for the distribution of illegal drugs." The government has persistently failed to explain how the Santa Muerte iconography in this case was a "means for the distribution of illegal drugs." And in the context of proposed expert testimony about "tools of the trade," the trial court's gatekeeping function should include an inquiry about how the alleged tool serves as a means of distribution. The district court erred by making no such inquiry in this case.

Despite reiterating the word at trial and throughout its appellate briefs, the government acknowledged at oral argument that "use" was an odd verb to describe the relationship between Santa Muerte and those who venerate her. We agree. It is easy to describe how a drug trafficker might "use" a razor blade to cut narcotics for distribution, a scale to weigh them, and small baggies to package them. But the government's inability at every stage of litigation to explain precisely how Santa Muerte can be "used" elucidates the poor fit between our "tools of the trade" jurisprudence and Almonte's purported area of expertise. It also highlights that further inquiry by the district court would have revealed that Almonte's testimony would not properly "help the trier of fact to understand the evidence or to determine a fact in issue."

Medina-Copete, 757 F.3d at 1102-03 (footnote omitted)(citations omitted). This passage appears to graft a functionality requirement onto rule 702, i.e., it appears to say that a physical object must "do" something related to the crime for the United States to be allowed to present expert testimony about the object. If so, Medina-Copete represents a departure from the prior cases, in which function was incidental to association, i.e., when some object or practice was a recognizable hallmark of a criminal organization, it was often because that object or practice aided the organization in the pursuit of its criminal goals, but what made the object or practice useful as evidence was the association -- the fact that organization members use it and non-members do not -- and not the function. After all, if a criminal organization used tools of the trade that had extremely high functionality in all aspects of the organization's criminal activity, but very little statistical association with the organization -- e.g., cars, credit cards, or cellular

telephones -- such "tools" would provide weak evidence that the person on whom the tool was found is, in fact, a member of the organization.

If that reading is correct, and Medina-Copete grafts a functionality prerequisite onto law enforcement expert testimony, then the case effectively creates a separate and new tools-of-the-trade "doctrine." How the Tenth Circuit distinguished a Santa Muerte prayer card from the non-tool "gang-related items" referenced in the second block-quoted paragraph is unclear.[9]

Medina-Copete might not be about functionality or tools of the trade at all, however. After discussing tools of the trade, the Tenth Circuit went on to talk about how the Marshal that the United States had named as its expert witness was unreliable under Daubert, because his

> conclusions are not the product of his personal *law enforcement* knowledge and experience -- he did not gather the information about these prayers and beliefs through surveillance, wiretaps, or even interviews of persons involved in this type of drug trafficking. Instead, Marshal Almonte calls upon his own self-study of the "iconography of the Mexican drug underworld," his observations of such icons in narcotics cases, his "four or five" trips to Mexico, and his self-published materials and training seminars on the subject.[[10]]

---

[9]It may be that the United States is required to show an association between the item in question and the specific gang in question, rather than just an association between the item and criminality generally, between the item and drug-trafficking generally, or between the item and several gangs. The third block-quoted paragraph above, see Medina-Copete, 757 F.3d at 1102, would seem to suggest that if more than one gang uses an item, then the item is not sufficiently associated with any one gang to render expert testimony on the association reliable. The case that Medina-Copete cited for this proposition, however, United States v. Robinson, contains no such limitation. In fact, the associational evidence of which the Tenth Circuit approved in that case included that "a preference for things blue tended to show that the defendants were involved in the Crips gang," and, obviously, not everyone who likes the color blue is a Crip. United States v. Robinson, 978 F.2d at 1561. It would seem to the Court that the "tightness" of an association between an item and a criminal organization goes to the associational evidence's weight, and not to its admissibility, but it may be that, after Medina-Copete, the evidence must clear some threshold level of associational tightness to be reliable under rule 702.

[10]The Marshal also published two books and has spent "hundreds, if not thousands[,] of hours of study' regarding 'how the Mexican drug traffickers involve the spiritual world in their activity.'" Medina-Copete, 757 F.3d at 1098 (quotation unattributed). The Court wonders, if a professor had testified instead of a U.S. Marshal, whether the result in Medina-Copete would

- 26 -

> [T]he absence of any explanation about how "visit[ing] several shrines" or "compil[ing] several cases" leads Almonte to the conclusions he reached in this case.  We are forced to conclude that Almonte's "opinion evidence [was] connected to existing data only by the ipse dixit of the expert."

Medina-Copete, 757 F.3d at 1103-04 (emphasis in both Medina-Copete and quoted source)

(citations omitted)(quoting United States v. Holmes, 751 F.3d 846, 854 (8th Cir. 2014)(Kelly, J.,

concurring)).[11]  Whatever it stands for, Medina-Copete is an outlier in an otherwise consistent

line of cases liberally permitting law enforcement expert testimony.[12]

---

have been different.  After all, the Tenth Circuit's opinion excluded evidence that it never said was irrelevant or untrue.

[11]In United States v. Holmes, the United States Court of Appeals for the Eighth Circuit came out the other way on the question the Tenth Circuit decided in Medina-Copete; the Eighth Circuit's case involved the same Marshal, Robert R. Almonte, and the Eight Circuit upheld his expert testimony on narco saints.  See 751 F.3d at 849.  The Honorable Jane L. Kelly, United States Circuit Judge for the Eight Circuit, wrote a concurrence in which she stated that she believed that the expert testimony had been improper, but the error was harmless.  See 751 F.3d at 854.  Medina-Copete quotes heavily from, and cites liberally to, Judge Kelly's concurrence.
    The Court has always thought it odd that the Tenth Circuit found it to be an abuse of discretion, and reversible error, to allow Marshal Almonte to testify, when each member of the Eighth Circuit panel either approved of his testimony or found it erroneous but harmless.

[12]The Court suspects that discomfort with the religious nature of the criminal inferences to which the prayer card gives rise -- distinct from the expert testimony fleshing out those inferences -- animated the Tenth Circuit's decision at least as much as Daubert principles did. Medina-Copete may thus be an inchoate First Amendment opinion more than it is an expert-witness opinion.
    That the Tenth Circuit would be concerned with religious artifacts giving rise to inferences of criminality is not irrational.  For example, regardless whether foreign terrorism thus far in the twenty-first century is statistically associated with Islam, it would be unseemly for the United States to use trappings of a criminal defendant's Islamic faith to support an inference that the defendant was associated with terrorist groups.  Cf. U.S. Const. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."); Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility.").
    Whether and when such concerns rise to the level of a First Amendment violation is an open question; the Court addressed the issue head-on and decided that expert testimony linking a folk-saint prayer card to the drug trade does not violate the First Amendment -- provided, of course, that the "link" can be reliably established.  The Tenth Circuit ducked the First

The Tenth Circuit has spoken on the subject of law enforcement expert testimony since Medina-Copete, and the Tenth Circuit's most recent word on law enforcement expert testimony leaves little doubt as to the liberality of the standard to be applied.  The new case, United States v. Vann, 776 F.3d 746 (10th Cir. 2015)(Tymkovich, J.), explicitly walks back the Tenth Circuit's earlier holding in Medina-Copete:

> [In] a recent case[,] . . . we found an abuse of discretion for admitting testimony of law enforcement personnel about drug traffickers display of "patron saints" for good luck while trafficking.  We held that it was inappropriate to admit speculative, meandering testimony regarding whether veneration of certain "narco" saints during a stop was evidence that the occupants of the vehicle knew that they were transporting drugs.  Agent Small's testimony is not vulnerable to the same attack.
>
> In addition, Medina-Copete is the exception not the rule, and, as noted, we have consistently allowed police officers to testify as to conclusions deriving from their expertise and experience.  At bottom, it is this circuit's longstanding view

---

Amendment issue, presumably on constitutional-avoidance grounds, but it left the following footnote in the opinion, tipping off readers to its concern:

> In this case, several representatives of the federal government took it upon themselves to define -- correctly or, as it appeared at times, not -- the tenets of Catholic theology and the legitimacy of religious practices.  Almonte, a representative of federal law enforcement, testified at length about which saints were "legitimate"; the prosecutors insisted (outside the presence of the jury) that "Santa Muerte is *not a saint*"; and the district court quoted another district court that distinguished Santa Muerte from "legitimate saints."  We urge the government to be cautious about appearing to take sides in theological debates.

Medina-Copete, 757 F.3d at 1109 n.6 (emphasis in original).  For the record, the Roman Catholic Church maintains an authoritative, non-debatable, and finite list of "legitimate" Saints, and there is a rather elaborate procedure associated with beatification and subsequent canonization.  See The Canonization of Pope John XXIII and Pope John Paul II, United States Conference of Catholic Bishops, http://www.usccb.org/about/leadership/holy-see/canonizations-john-xxiii-john-paul-ii.cfm (last visited July 2, 2015).  Whether someone is a Saint in the Catholic Church is something which a district court could take judicial notice under rule 201(b)(2), as this status "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The Court suspects that the Honorable Neil M. Gorsuch, United States Circuit Judge for the Tenth Circuit, who is a major proponent and practitioner of constitutional-avoidance doctrine, was probably persuaded to join the majority opinion to avoid the First Amendment issue.

that "police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters."

United States v. Vann, 776 F.3d at 759 (citations omitted).

United States v. Vann also provides a useful characterization of another recent Tenth Circuit case on the topic of law enforcement expert testimony, United States v. Kamahele, ascribing great importance to that case:

> This court's decision in United States v. Kamahele explains the circumstances under which police officers can testify as experts. That case reaffirmed that "police officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld.'" Moreover, Kamahele specifically collected cases in which the court had allowed police officers to testify as experts regarding "means and methods of drug dealing." Ultimately, the court upheld the officer's testimony as an expert because he (1) "relied on multiple sources," (2) "based his expert testimony on years of experience," and (3) provided specific "insights into the distinctive traits" of his area of expertise.

United States v. Vann, 776 F.3d at 758 (alteration in original)(citations omitted). It seems unlikely that these three requirements are sufficient, in every case, to render law enforcement expert testimony appropriate. United States v. Vann couples its characterization of United States v. Kamahele with the adages -- applicable in all expert-witness context, and not just with law enforcement experts -- that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination," United States v. Vann, 776 F.3d at 758 (alteration omitted)(emphasis in both United States v. Vann and quoted source)(quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999)), and that "district courts [need not] extensively explain their reliability determinations," United States v. Vann, 776 F.3d at 758 (quoting United States v. Avitia-Guillen, 680 F.3d 1253, 1260 (10th Cir. 2012)).

2.        **The Special Dangers of Expert Testimony by Law Enforcement Officers**.

Although the Tenth Circuit has been generally enthusiastic about law enforcement expert

testimony, there are a number of ways in which it can run afoul of the rules of evidence.  The

leading case and most comprehensive case in outlining these dangers is United States v. Mejia,

545 F.3d 179, 188-93 (2d Cir. 2008)(Hall, J.)("Mejia").  In that case, the United States

> called Hector Alicea, an investigator with the New York State Police, to testify
> regarding MS-13's "enterprise structure and the derivation, background and
> migration of the MS-13 organization, its history and conflicts," as well as
> MS-13's "hierarchy, cliques, methods and activities, modes of communication
> and slang."  Alicea had been an officer of the New York State Police for eighteen
> years, and he had been an investigator since 1992.  In June 2000, five years before
> the trial, Alicea had been assigned to the FBI Long Island Gang Task Force.  He
> was also the Chair of the Intelligence Committee of the East Coast Gang
> Investigators Association.
>
> . . . Alicea stated that he had participated in somewhere between fifteen and fifty
> custodial interrogations of MS-13 members.  When asked whether he could
> distinguish between information he had learned during custodial interrogations
> and information he had learned elsewhere, Alicea responded that his knowledge
> was based on "a combination of both." . . .
>
> Much of Alicea's testimony concerned MS-13's background.  He testified
> about MS-13's history, its presence on Long Island, and its national and
> international presence; about the gang's colors, hand signs, graffiti use, naming
> practices, and tattoos; and about its local subunit structure, leadership structure,
> division of responsibilities, and membership rules.  In addition, Alicea testified to
> more specific details about MS-13's operations.  He stated that when MS-13
> members fled from prosecution or needed to travel for "gang business reasons,"
> such as "to transport narcotics," "to transport weapons," or "to commit crimes in
> other areas," they traveled "on a Greyhound bus" or by car.  According to Alicea,
> MS-13 members from Virginia, California, and El Salvador had attended
> organizational meetings in New York State, and MS-13 leaders throughout the
> nation communicated with each other by telephone.  He testified that MS-13
> treasury money "[was] used to buy guns," to help members in prison or in other
> states, or to buy narcotics.  Significantly, Alicea also asserted that MS-13 needed
> guns "to do what MS 13 does, which is, you know, shoot at rival gang members,
> and sometimes in the process, obviously, some people get hit."
>
> With respect to MS-13's activities on Long Island, Alicea testified that
> since he had joined the Task Force in June 2000, the Task Force had seized
> "[p]robably between 15 and 25" firearms from MS-13 members.  He further
> testified that Task Force members had seized ammunition, manufactured outside

of New York State, from MS-13 members on Long Island.   Moving on to MS-13's narcotics-related operations, Alicea told the jury that MS-13 members on Long Island had been arrested for dealing narcotics, primarily cocaine, and that the gang also occasionally dealt marijuana.   Alicea also stated that MS-13 "tax [ed]" non-gang drug dealers who wished to deal drugs in bars controlled by MS-13.   Most importantly, Alicea attested that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.

On cross-examination, defense counsel probed the sources of Alicea's information.   Because of the importance of Alicea's answers, we quote from his testimony at length:

> Q.   . . . I thought you mentioned FLS . . . funded itself at the beginning from the sale of marijuana?

> A.   No.   I was referring to the MS-13 gang as a whole.

> Q.   Is it fair to say that somebody told you that?

> A.   I had read that from some of the articles that I had researched.

> Q.   Newspaper articles?

> A.   Reports from other law enforcement personnel.

> . . . .

> Q.   You also told us that MS members . . . put a tax on narcotics sales in certain bars; is that correct?

> . . . .

> A.   I was told that by a gang member, yes.

> . . . .

> Q.   And I believe you told us that some of those [membership] dues were used to purchase narcotics?

> A.   That's correct.

> Q.   Is it fair to say that that was told to you also by somebody who was in custody?

> A.   In custody and some that were not.

Q.  Well, can you tell me . . . how many people in custody told you in substance that monies collected were used for narcotics?

A.  Probably like a dozen.

. . . .

A.  . . . I said I am aware that there has been contact between California and New York.

Q.  And how did you become aware of it?

A.  Listening to recordings.

. . . .

Q.  And you stated that you got information with regard to MS-13s involved with Mexican drug cartels; is that correct?

A.  Yes.

Q.  And where did you get that information from?

A.  From research on the Internet.

Q.  Do you know the source of that information on the Internet?

A.  Not off the top of my head.  But I did retrieve that.

Q.  Is it law enforcement or reporters?

A.  I think it is a combination of a reporter doing a story and having a conversation with law enforcement.

. . . .

Q.  . . . [W]ith regard to the involvement of MS-13 [with] the Mexican cartels or Colombian cartels, you never interviewed anybody who told you that, it was strictly from the Internet; is that correct?

A.  That is correct.

<u>Mejia</u>, 545 F.3d at 186-88 (hearing transcript omissions in original)(footnote omitted).   The

Second Circuit had numerous qualms with this testimony:

> [D]espite the utility of, and need for, expertise of this sort, its use must be limited
> to those issues where sociological knowledge is appropriate.   An increasingly
> thinning line separates the legitimate use of an officer expert to translate esoteric
> terminology or to explicate an organization's hierarchical structure from the
> illegitimate and impermissible substitution of expert opinion for factual evidence.
> If the officer expert strays beyond the bounds of appropriately "expert" matters,
> that officer becomes, rather than a sociologist describing the inner workings of a
> closed community, a chronicler of the recent past whose pronouncements on
> elements of the charged offense serve as shortcuts to proving guilt.   As the
> officer's purported expertise narrows from "organized crime" to "this particular
> gang," from the meaning of "capo" to the criminality of the defendant, the
> officer's testimony becomes more central to the case, more corroborative of the
> fact witnesses, and thus more like a summary of the facts than an aide in
> understanding them.   The officer expert transforms into the hub of the case,
> displacing the jury by connecting and combining all other testimony and physical
> evidence into a coherent, discernible, internally consistent picture of the
> defendant's guilt.
>
> In such instances, it is a little too convenient that the Government has
> found an individual who is expert on precisely those facts that the Government
> must prove to secure a guilty verdict -- even more so when that expert happens to
> be one of the Government's own investigators.   Any effective law enforcement
> agency will necessarily develop expertise on the criminal organizations it
> investigates, but the primary value of that expertise is in facilitating the agency's
> gathering of evidence, identification of targets for prosecution, and proving guilt
> at the subsequent trial.   When the Government skips the intermediate steps and
> proceeds directly from internal expertise to trial, and when those officer experts
> come to court and simply disgorge their factual knowledge to the jury, the experts
> are no longer aiding the jury in its factfinding; they are instructing the jury on the
> existence of the facts needed to satisfy the elements of the charged offense. . . .
> The Government cannot satisfy its burden of proof by taking the easy route of
> calling an "expert" whose expertise happens to be the defendant.   Our occasional
> use of abstract language to describe the subjects of permissible officer expert
> testimony cannot be read to suggest otherwise.
>
> This Court has not been blind to these risks.   More than fifteen years ago,
> we observed that although "the operations of narcotics dealers are a proper subject
> for expert testimony under Fed. R. Evid. 702, we have carefully circumscribed the
> use of such testimony to occasions where the subject matter of the testimony is
> beyond the ken of the average juror." . . .
>
> . . . .

[C]ase agents testifying as experts are particularly vulnerable to making "sweeping conclusions" about the defendants' activities.

We have identified two distinct ways in which the officer expert might "stray from the scope of his expertise." The expert might . . . "testif[y] about the meaning of conversations in general, beyond the interpretation of code words." Or, we noted, the expert might "interpret[ ] ambiguous slang terms" based on knowledge gained through involvement in the case, rather than by reference to the "fixed meaning" of those terms "either within the narcotics world or within this particular conspiracy."

. . . .

Testimony is properly characterized as "expert" only if it concerns matters that the average juror is not capable of understanding on his or her own. See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1992)(applying the "untrained layman" standard articulated in the Advisory Committee Notes to Rule 702).

Much of Alicea's testimony concerned material well within the grasp of the average juror. A few examples are particularly striking: Alicea's testimony that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial. No expertise is required to understand any of these facts. Had the Government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have "intelligently" interpreted and understood it.

. . . .

Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if "experts in the field reasonably rely on such evidence in forming their opinions." Alicea unquestionably relied on hearsay evidence in forming his opinions. This hearsay evidence took the form of statements by MS-13 members given in interviews, both custodial and noncustodial, as well as statements made by other law enforcement officers, statements from intercepted telephone conversations among MS-13 members (which may or may not have been hearsay, depending on whether the conversations were in the course of and in furtherance of the charged conspiracies), and printed and online materials. Alicea's reliance on such

materials was consistent with the ordinary practices of law enforcement officers, who "routinely and reasonably rely upon hearsay in reaching their conclusions."

The expert may not, however, simply transmit that hearsay to the jury. Instead, the expert must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials. Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the Government "to circumvent the rules prohibiting hearsay."

At trial, Alicea was unable to separate the sources of his information, stating that his testimony was based on "a combination of both" custodial interrogations and other sources. On cross-examination, however, Alicea identified hearsay as the source of much of his information. For example, his testimony that the Freeport clique initially funded itself through drug sales was based on "some of the articles that [he] had researched" and "[r]eports from law enforcement personnel." His testimony about MS-13's taxation of drug sales by non-members was based on a gang member having told him so during a custodial interrogation in this case. Alicea had learned about MS-13 treasury funds from about a dozen MS-13 members both in and out of custody. Additionally, Alicea discovered his information about MS-13's involvement in Mexican immigrant smuggling through "research on the Internet," and more specifically from a website containing a media report and an interview with a law enforcement official. And although Alicea did not identify the source of his statements about the number of firearms the Task Force had seized and the number of murders on Long Island that MS-13 members had committed, we cannot imagine any source for that information other than hearsay (likely consisting of police reports, Task Force meetings, conversations with other officers, or conversations with members of MS-13).

Mejia, 545 F.3d at 190-94, 197 (citations omitted).

There are, thus, many different angles from which defendants can attack law enforcement officers' expert testimony, and equally many pitfalls into which district courts can fall in admitting such testimony. The Court can identify at least six such dangers.

First, as the officer's expertise narrows in scope from broad generalities about certain criminal practices -- which are fixed in a meaning that transcends the case at hand, and about which the expert knew before his involvement in the case being tried -- to practices of which the expert has learned only through his or her investigation of the instant case, there is the danger

that the expert is cloaking percipient testimony in the garb of expert opinion.  See Mejia, 545 F.3d at 190 ("As the officer's purported expertise narrows from 'organized crime' to 'this particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.").  At the grand-jury stage, it is common for the United States to put on only a single witness -- a case agent, who succinctly summarizes the case, relaying facts to the grand jury that are outside of the agent's personal knowledge but were transferred to the agent through hearsay.  See United States v. Brito, 907 F.2d 392, 394 (2d Cir. 1990)("The government admits to a policy of using a single witness before the grand jury in narcotics cases where the defendant is already under arrest.").  This practice may be acceptable at the charging stage; the judiciary long ago ceased guarding the grand jury's function as a shield against unjust prosecution, and the institution has largely been rendered a paper tiger in modern times.  See United States v. Basurto, No. CR 13-0969 JB, 2015 WL 4635715, at *13 n.5 (D.N.M. July 29, 2015)(Browning, J.)("[T]he institution of the grand jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors.").  The expert-testimony rules are not an invitation to the United States to turn the jury trial into the same type of proceeding, wherein a single expert -- whose expertise is really just in the case at hand -- can serve as proof of the prosecution's entire case.  To prevent this danger, the district court must limit the officer's testimony in three important ways.  First, expert testimony is only proper if a typical juror would be unable to fully understand without expert assistance.  See Fed. R. Evid. 702 advisory committee's notes to the 1972 proposed rule ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier . . . .

[The test is] 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without [the expert testimony].'" (citation omitted)); United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994) (disapproving of an expert's answer to the question of why smugglers would use false names -- "'[w]ell that's obvious . . . to avoid being caught'" -- because it was "well within the bounds of a jury's ordinary experience"); United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993) (precluding expert testimony on "areas believed to be within the jurors' common understanding").  Second, the expert must be able to point to a foundation for his or her expertise that rests principally outside of the facts of the case being tried.  See Fed. R. Evid. 702(d) (requiring that "the expert has reliably applied the principles and methods to the facts of the case" (emphasis added)); Mejia, 545 F.3d at 193 (holding that it is improper for an expert to "'interpret[] ambiguous slang terms' based on knowledge gained through involvement in the case, rather than by reference to the 'fixed meaning' of those terms" (alteration in original) (quoting United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2002))).  The officer cannot develop "expertise" from investigating a case -- e.g., that when members of an organization refer to "haircuts" on the telephone, they are talking about drug deals -- only to "apply" that supposed expertise at trial to prove the very same purported facts -- that the organization's members were referring to drug deals when they used the term "haircuts" in wiretapped conversations -- from which the officer derived the expertise.  Using expert testimony in this circular fashion is misleading to the jury; the district court is, in effect, vouching for a fact witness' conclusions --

and counsel's arguments -- about what the term "haircut" means, by branding the witness an expert and thus suggesting that the witness' process for determining the term's meaning transcends the case at hand.   Third, if a witness testifies as both an expert witness and a percipient witness, the district court should demarcate for the jury what portions of the testimony are expert opinion[13] and what portions are fact testimony.   See United States v. Lopez-Medina, 461 F.3d 724, 745 (6th Cir. 2006)("Because there was no cautionary jury instruction regarding the agents' dual witness roles nor a clear demarcation between their fact testimony and expert opinion testimony, we conclude that the district court committed an error that was plain or obvious in permitting the dual-role testimony.").

A second danger inherent in expert testimony by law enforcement officers is common to all situations where a witness' expertise is based on experience, rather than on scientific or technical principles.   It is easy for an experience-based expert witness to pass off suspicion, speculation, and intuition as real expertise.   See Joelle Anne Moreno, What Happens When Dirty Harry Becomes an (Expert) Witness for the Prosecution?, 79 Tul. L. Rev. 1, 30 (2004)("When an expert opinion is based on personal experience, opinions and conclusions derived from this experience are often personal, idiosyncratic, and subjective. . . .  '[T]he practical result is that the [experience-based expert] witness is immunized against effective cross-examination.'"  (footnote

---

[13]The Court, in an attempt never to put its thumb on the scales or its imprimatur on a particular witness, tries not to use the word "expert witness" in front of the jury.  Instead, when an expert witness' proponent asks the Court to accept the witness as an expert, the Court simply says that it will allow the witness to offer opinion testimony in certain areas.  See United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1235 (D.N.M. 2011)(Browning, J.)("[T]he Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions will not refer to him as an expert.").

At least one court, in its attempt to reduce a law enforcement officer's sway on the jury, refused to allow the United States to refer to its expert witness as an "expert" in front of the jury, instead opting for the term "opinion witness."   United States v. Thomas, 797 F. Supp. 19, 24 (D.D.C. 1992)(Richey, J.).  The Court would not be as inclined to hamstring the United States, particularly in its closing arguments, as it would be to simply be cautious about its own words.

omitted)).  To prevent this danger, the district court must vigilantly apply the rule 702 reliability standard to each opinion or assertion to which the defendant objects and, again, ensure that facts outside of the case at hand back the witness' expertise.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (applying the rule 702 reliability standard to nonscientific expert testimony). Although expert witnesses generally need not disclose the bases of their assertions or opinions as they give them, see Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion -- and give the reasons for it -- without first testifying to the underlying facts or data."), an expert's obligation to show his or her work by establishing legitimate bases for the testimony may be higher when the expertise is of an experiential nature, see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)(stating that district courts should not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"); Erickson v. Baxter Healthcare, Inc., 131 F. Supp. 2d 995, (N.D. Ill. 2001)(Bucklo, J.)("More than bald assertions of opinion without any support are required; this is no more than any rational person would require. . . .  It would be unacceptable to cite no sources for statistical evidence in a scholarly work, and it is likewise unacceptable in an expert disclosure."  (footnote omitted)).  Cf. Olander v. Bucyrus-Erie Co., 187 F.3d 599, 608 (7th Cir. 1999)("[O]ne bald assertion is as good as another . . . .").

A third danger is that stray facts and background information are often more damaging in the context of law enforcement testimony than with other expert testimony.  See Fed. R. Evid. 403.  A forensic accountant off-handedly mentioning that an organization's practice of maintaining a bank account in the Cayman Islands is per se suspicious may be somewhat damaging, but a law enforcement officer testifying about how the defendant rose to his position within an organization by supporting the murder of the organization's former leader is likely to be damning.  This observation is not so much a separate danger as it is a recognition that minor

errors in admitting expert testimony that should have been excluded -- errors that can happen in a

matter of seconds in the courtroom -- can render an entire trial unfair.

A fourth danger is that law enforcement experts who were also involved in the

investigation of the case -- the most dangerous kind -- will often attempt to use profile evidence

to bolster their conclusions about the defendant.   "[A] profile is simply an investigative

technique.   It is nothing more than a listing of characteristics that in the opinion of law

enforcement officers are typical of a person engaged in a specific illegal activity."  United States

v. Robinson, 978 F.2d at 1563.  "A more tailored definition was offered in Florida v. Royer, 460

U.S. 491, 493 (1983), where drug courier profile was described as an abstract of characteristics

found to be typical of persons transporting illegal drugs."  United States v. Robinson, 978 F.2d

at 1563 (internal quotation marks omitted).  Although most "[c]ourts have condemned the use of

profiles as substantive evidence of guilt," the Tenth Circuit has been consistently more

permissive than most other Circuits in allowing such evidence.  United States v. Robinson, 978

F.2d at 1563.  In the first of its two major profile-evidence cases, the Tenth Circuit wrote:

> Rather than focusing our inquiry upon defining and classifying evidence
> into categories of profile or non-profile, we believe the better approach is to
> commence our inquiry with an examination of the applicable rules of evidence.
> Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the
> trier of fact in understanding the evidence. Rule 702 thus dictates a common-
> sense inquiry of whether a juror would be able to understand the evidence without
> specialized knowledge concerning the subject.

United States v. McDonald, 933 F.2d 1519, 1563 (10th Cir. 1991).  The Tenth Circuit continued

this approach -- effectively telling district courts not to worry about whether a given piece of

evidence is profile evidence -- through its second major profile-evidence case, and it remains

unclear today whether and when "profile evidence" -- if a given piece of evidence is agreed to be

just that -- is admissible in the Tenth Circuit.  "In McDonald, we 'reserv[ed] the question of

whether expert testimony regarding profiles is -- by itself -- substantive proof of crime . . . .'  We again decline to decide that matter, both because this was not evidence of a profile under the McDonald definition and because the expertise of this particular witness was necessary."  United States v. Robinson, 978 F.2d at 1564 (omission in original).  Although the Court does not allow the United States to use the term "profile" in front of the jury, nor has it ever excluded evidence or curbed testimony on the ground that it would constitute impermissible profile evidence.  United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1251 (D.N.M. 2012)(Browning, J.)("The United States should instruct [its witness], however, not to use the word profile to avoid the issue of profile evidence such that the jury would think about that issue.").  See United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3894137, at *6-7 (D.N.M. July 31, 2010)(Browning, J.).

A fifth danger is that the United States will use the expert witness to circumvent the rules of evidence.  An expert witness may rely upon any

> facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Civ. P. 703.  "The expert may not, however, simply transmit . . . hearsay [or other inadmissible evidence] to the jury."  Mejia, 545 F.3d at 197.  This danger always exists with regard to expert witnesses, but it is especially great with law enforcement expert testimony, because -- as the Court has already mentioned -- the inadmissible facts on which law enforcement experts rely are often far more prejudicial to the defendant than those on which scientific and technical experts rely.

Sixth, and finally, there is something qualitatively different about law enforcement expertise from other forms of expertise that makes the Court uncomfortable.  When an expert testifies about DNA left at a crime scene or an organization's bookkeeping, he or she does so in

recognition of the fact that most jurors are inexpert in matters of molecular biochemistry or forensic accounting, and to aid them in understanding such evidence and making determinations well shy of the final determination of the defendant's guilt or innocence.  Law enforcement officers, on the other hand, are experts in whodunit, and there is a danger that a jury will perceive their area of expertise as solving crimes and determining guilt or innocence.  Juries -- or at least individual jurors -- are inexpert in making these determinations just as surely as they are in biochemistry and forensic accounting, but the Constitution nonetheless consciously vests the power to make these findings in the jury.  See U.S. Const. art. III, § 2; id. amend. VI.  Expert testimony by law enforcement officers can encroach not only on the jury's role, but on the role of counsel, as well.  When the expert opines on the basis of "expertise" rooted in the facts of the case being tried, it is effectively arguing the case as a mouthpiece for counsel.  It is inappropriate for an expert witness to bolster the credibility of another witness, and the Court finds this use of law enforcement expert testimony -- which effectively serves to bolster counsel's arguments about how the jury should interpret the case's facts -- reminiscent of, and analogous to, credibility bolstering.

Even if these dangers do not render a given opinion or piece of testimony per se inadmissible under rule 702, they contribute to its unfair prejudicial value, which the district court may determine substantially outweighs any probative value it might have.  See United States v. Fosher, 590 F.2d 381, 383 (1st Cir. 1979)("Quite apart from questions of limited relevance and reliability, . . . the proffered expert testimony would create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness.").

## LAW REGARDING RULE 16(b)(1)(A) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Rule 16(b)(1)(A) provides a "reciprocal discovery requirement" between the United States and a criminal defendant.  United States v. Hardy, 586 F.3d 1040, 1043 (6th Cir. 2009). Rule 16(a)(1)(E) provides criminal defendants with a right to inspect and to copy documents and objects that are within the United States' possession, custody or control.  See Fed. R. Crim. P. 16(a)(1)(E).  Rule 16(a)(1)(E) provides:

> **(E)  Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> **(i)**  the item is material to preparing the defense;
>
> **(ii)**  the government intends to use the item in its case-in-chief at trial; or
>
> **(iii)**  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Once a defendant makes a request under rule 16(a)(1)(E), and the United States has complied with the request, rule 16(b)(1)(A) provides the United States with a right to inspect and to copy certain documents in the defendant's "possession, custody, or control," and that the defendant intends to use at trial during his or her case-in-chief.  Fed. R. Crim. P. 16(b)(1)(A).  Rule 16(b)(1)(a) specifically provides:

> **(A)  Documents and Objects.** If a defendant requests disclosure under Rule 16(a)(1)(E) and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if:
>
> **(i)**  the item is within the defendant's possession, custody, or control; and

        **(ii)**    the defendant intends to use the item in the defendant's case-in-chief at trial.

Fed. R. Crim. P. 16(b)(1)(A).  Certain information, however, is not subject to disclosure under rule 16(b)(1)(A).

      **(2)**    **Information Not Subject to Disclosure.** Except for scientific or medical reports, Rule 16(b)(1) does not authorize discovery or inspection of:

          **(A)**    reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense; or

          **(B)**    a statement made to the defendant, or the defendant's attorney or agent, by:

              **(i)**    the defendant;

              **(ii)**    a government or defense witness; or

              **(iii)**    a prospective government or defense witness.

Fed. R. Crim. P. 16(b)(2).  Rule 16(b)(2) is considered to be the "work product exception[] to the general discovery requirements."   Fed. R. Crim. P. 16 advisory committee's notes (1975 enactment).  See United States v. Fort, 472 F.3d 1106, 1123 (9th Cir. 2007)("Rule 16 of the Federal Rules of Criminal Procedure recognizes the work product privilege."  (alterations omitted)(quoting United States v. Fernandez, 231 F.3d 1240, 1247 (9th Cir. 2000)).

    A defendant's duty to disclose under rule 16(b) does not arise until the United States first complies with the defendant's request under rule 16(a).  See United States v. McVeigh, 954 F. Supp. 1141, 1149 (D. Colo. 1997)("Compliance with such a request [under rule 16(a)] triggers the defense obligation to provide reciprocal discovery under Rule 16(b)").  Once a party has a duty to disclose under rule 16(a) or rule 16(b), that duty continues throughout the case as

additional evidence is discovered.  See United States v. McVeigh, 954 F. Supp. at 1149 (citing

Fed. R. Crim. P. 16(c)).  Rule 16(c) provides:

> **(c)**     **Continuing Duty to Disclose.** A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if:
>
> > **(1)**     the evidence or material is subject to discovery or inspection under this rule; and
> >
> > **(2)**     the other party previously requested, or the court ordered, its production.

Fed. R. Crim. P. 16(c).  A defendant's obligations under Rule 16(b)(1)(A) apply only to evidence

that he or she "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P.

16(b)(1)(A).  In United States v. Harry, No. CR 10-1915, 2014 WL 6065705 (D.N.M. Oct. 14,

2014)(Browning, J.), the Court defined the term "case-in-chief" to mean the part of a trial during

which a party presents evidence to support a claim or defense, and after which it rests.  2014 WL

6065705, at *6 ("The Court concludes that rule 16(b)(1)(A)'s drafters intended for the word

'case-in-chief' to have a more restrictive meaning -- the more traditional 'part of a trial in which

a party presents evidence to support the claim or defense.'"  (quoting Black's Law Dictionary

224 (9th ed. 2009))).  The Court, thus, concluded that evidence used in a party's case-in-chief

"refers to evidence that a party presents between the time that the party calls its first witness and

the time the party rests," and not to evidence that a party introduces while cross-examining the

other party's witness.  2014 WL 6065705, at *10.

If a defendant refuses to disclose evidence required under rule 16(b)(1)(A), the trial court

may order the defendant to disclose the evidence or prohibit the defendant from introducing the

undisclosed evidence at trial.  See Fed. R. Crim. P. 16(d)(2).  See also United States v. Rodriguez

Cortez, 949 F.2d 532, 546 (1st Cir. 1991)("It is within the trial court's discretion to exclude evidence for non-compliance with 16(b)(1)(A).").

## ANALYSIS

The Court will grant in part and deny in part the United States' requests in the Motion to Compel, and will deny L. Chapman's requests in the Response. The Rapoport Notice gives the United States insufficient notice to prepare for trial. The Court will, thus, order L. Chapman to disclose every diagnosis about which Dr. Rapoport will testify. Because the United States may have alleviated L. Chapman's need to conduct a voir dire, the Court will deny L. Chapman's request without prejudice to renew after he reviews the articles on which Starr relied. Finally, L. Chapman does not present any new arguments, law, or evidence to make the Court question its ruling in the MOO, and the Court remains confident that its ruling is correct. It will, accordingly, deny L. Chapman's request to exclude Starr's testimony.

## I.   THE COURT WILL REQUIRE L. CHAPMAN TO PROVIDE THE UNITED STATES WITH A LIST OF DIAGNOSES ABOUT WHICH RAPOPORT WILL TESTIFY.

The Court will require L. Chapman to provide the United States with a list of diagnoses about which Rapoport will testify. Rule 16(a)(1)(G) states:

> **(G)**    **Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

- 46 -

Fed. R. Crim. P. 16(a)(1)(G).  Once a defendant makes a request under rule 16(a)(1)(G), rule

16(b)(1)(C) places an obligation on the defendant to provide the United States with similar

information concerning his or her experts.

>  **(C)   Expert witnesses.** -- The defendant must, at the government's request,
>  give to the government a written summary of any testimony that the
>  defendant intends to use under Rules 702, 703, or 705 of the Federal Rules
>  of Evidence as evidence at trial, if --
>
>  >  **(i)**   the defendant requests disclosure under subdivision
>  >  (a)(1)(G) and the government complies; or
>
>  >  **(ii)**   the defendant has given notice under Rule 12.2(b) of an
>  >  intent to present expert testimony on the defendant's mental
>  >  condition.
>
>  This summary must describe the witness's opinions, the bases and reasons for
>  those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).

Here, the Order, filed January 28, 2014 (Doc. 9)("Discovery Order"), states that, unless

Chapman filed a waiver within seven days, he is deemed to have requested all discovery listed in

rule 16, triggering rule 16's reciprocal discovery obligations.  Discovery Order at 1.  In

conformance with rule 16(c), see Fed. R. Crim. P. 16(c) (discussing the continuing discovery

duty), the Discovery Order places on the parties a continuing duty to disclose, see Discovery

Order at 4.  L. Chapman did not file a waiver to any discovery obligations.  Consequently, under

the Discovery Order, he and the United States are under rule 16's reciprocal discovery

obligations, which include expert reports.

In the Motion to Compel, the United States asks the Court to compel L. Chapman to

provide it with a report or a summary of Rapoport's testimony.  See Motion to Compel at 4.

L. Chapman provided the United States and the Court with the Rapoport Letter, in which

Dr. Rapoport states that there is not enough information to diagnose D. Chapman and that six

different diagnoses could possibly explain her behavior.  See Rapoport Letter at 1-2.  At the October 28, 2014, hearing, L. Chapman stated that Dr. Rapoport would testify that a number of conditions, other than reacting to a traumatic experience, could explain why D. Chapman injured herself.  See Oct. 28, 2014, Tr. at 36:16-20 (Robert).  The United States said that this information was still insufficient without knowing what disorders Dr. Rapoport will say may be responsible for D. Chapman's conduct.  See Oct. 28, 2014, Tr. at 36:22-6 (Mott).  The Court agrees with the United States.

Without knowing what other disorders about which Dr. Rapoport will testify, the United States cannot properly respond to his testimony and cannot properly cross-examine him.  As rule 16's advisory committee notes show, the reciprocal expert discovery rules are intended to allow the other side to adequately prepare for trial.  See Fed. R. Crim. P. 16, Advisory Committee Notes to 1993 Amendments ("This provision is intended to permit more complete pretrial preparation by the requesting party.  For example, this should inform the requesting party whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion.").  The United States cannot fully prepare for Dr. Rapoport's testimony if it only knows that he will testify about five possible conditions without knowing what those conditions are.  At the October 28, 2014, hearing, the United States said that, if L. Chapman provides it with a list of every condition about which Dr. Rapoport will testify, it will have sufficient information to prepare for trial and to cross-examine Dr. Rapoport.  See Oct. 28, 2014, Tr. at 38:9-17 (Mott, Robert, Court).  Consequently, the Court will order L. Chapman to provide the United States with a list of the conditions about which Dr. Rapoport will testify rather than excluding Dr. Rapoport's testimony under rule 16(d)(2).

## II.   THE COURT WILL DENY L. CHAPMAN'S REQUEST FOR VOIR DIRE WITHOUT PREJUDICE TO RENEW THE REQUEST AFTER HE REVIEWS THE ARTICLES THAT STARR PROVIDED.

The Court will deny L. Chapman's request for voir dire without prejudice to renew the request after he reviews the articles that Starr provided.  At the October 28, 2014, hearing, after the United States said that it would provide L. Chapman with every article on which Starr relied, the Court asked L. Chapman whether he had sufficient information or whether he still believed that voir dire was necessary.  See Oct. 28, 2014, Tr. at 46:18-23 (Mott, Court).  L. Chapman said that he thought that he would still need to conduct voir dire of Starr, but that he could not be sure, because he had not yet read the articles that the United States provided him.  See Oct. 28, 2014, Tr. at 46:24-47:21 (Converse, Court).  Because the articles may have alleviated L. Chapman's need to conduct a voir dire examination of Starr, the Court will, at this time, deny L. Chapman's request without prejudice to renew the request after he reviews the articles that Starr has listed.  If, however, L. Chapman reviews the articles and decides that he still needs to conduct a voir dire examination, the Court will permit him to renew his request, and the Court will consider it at that time.

## III.   THE COURT STANDS BY ITS RULING IN THE MOO.

In the Response -- which L. Chapman filed before the Court issued the MOO, but after the Court ruled on the Motion to Exclude at the September 12, 2014, hearing -- L. Chapman asks the Court to reconsider its ruling on the Motion to Exclude.  See Response at 1.  In the Response, L. Chapman's main argument for exclusion is that, because D. Chapman has not been examined or diagnosed, Starr's testimony is speculation.  See Response ¶¶ 9-15, at 4-7.  He also argues that the Court should exclude Starr's testimony as too unfairly prejudicial under rule 403.  See Response ¶ 16, at 7.  L. Chapman does not, however, elaborate on his rule 403 argument, other

than stating: "As argued before."  Response ¶ 16, at 7.  In supporting the Motion to Exclude,

L. Chapman raised both of these arguments.  At the September 12, 2014, hearing, he argued that

Starr's testimony is too speculative, because she will merely testify why D. Chapman may have

injured herself without being able actually diagnose her.  See Sept. 12, 2014, Tr. at 14:19-15:7

(Robert); id. at 16:2-10 (Robert); id. at 29:9-32:6 (Robert, Court).  In the Motion to Exclude,

L. Chapman argued that rule 403 requires the Court to exclude Starr's testimony.  See Motion to

Exclude ¶ 8, at 4.  The Court addressed both of these issues in the MOO.

In the MOO, the Court reasoned that Starr's testimony that D. Chapman's conduct was

consistent with the conduct of a victim of a traumatic event was appropriate, even though Starr

could not conclude that D. Chapman was the victim of a traumatic event.  The Court explained:

> Starr's testimony is similar to the testimony that the Tenth Circuit
> approved in United States v. Charley and that this Court approved [i]n United
> States v. Harry.  In United States v. Charley, the expert witness testified that the
> girls' symptoms and conduct was consistent with those of sexual assault victims.
> See United States v. Charley, 189 F.3d at 1263-64.  The girls both testified that
> the defendant had sexually assaulted them.  See United States v. Charley, 189
> F.3d at 1258.  The Tenth Circuit held that this testimony was permissible expert
> testimony, see United States v. Charley, 189 F.3d at 1264-65, despite the dissent
> of the Honorable William J. Holloway, United States Circuit Judge for the Tenth
> Circuit, who argued that the testimony constituted impermissible vouching, see
> 189 F.3d at 1276 (Holloway, J., dissenting).  Similarly, in United States v. Harry,
> the Court allowed a SANE nurse to testify that a sexual assault victim's injuries
> were consistent with her version of events -- that the defendant raped her.  See
> 2014 WL 1949993, at *34.  The Court noted that the expert could not determine
> whether the sex was consensual or whether the defendant was the alleged abuser.
> See United States v. Harry, 2014 WL 1949993, at *35.  The Court, however,
> excluded the testimony of another expert who sought to testify that the victim's
> demeanor . . . during the sexual assault examine suggested that she was not
> assaulted, because the credibility of witnesses was not an appropriate subject for
> expert testimony.  See United States v. Harry, 2014 WL 1949993, at *36-38.  The
> Court reached a similar conclusion in United States v. Chaco.  See 801 F. Supp.
> 2d at 1216 (allowing a doctor to testify that a sexual assault examination was
> consistent with the conclusion that the victim had been sexually assaulted but
> prohibiting testimony that victim was actually sexually assaulted, because that
> conclusion was based on statements made by the victim).

. . . .

Concerning L. Chapman's final argument -- that the jury will be given information about self-injury and self-harm, and then have to make the diagnosis -- this testimony, and this request of the jury, is not inconsistent with ordinary expert testimony.  In United States v. Koruh, 210 F.3d 390, No. 99-2138 (10th Cir. Apr. 3, 2000)(unpublished), the Tenth Circuit, in an opinion that the Honorable H. Dale Cook, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation, wrote, and that Judges Kelly and Murphy joined, affirmed a district court's ruling to admit expert testimony on the conduct and symptoms of sexual assault victims.  See No. 99-2138, at *2, 4. There, the expert did not testify about the facts of the case or about the particular victims, whom she had not examined, but rather testified about the characteristics that a sexual assault victim might exhibit.   See United States v. Koruh, No. 99-2138, at *2.  The Tenth Circuit noted that "[e]xpert testimony which addresses 'a class of victims generally,' and not the 'particular testimony of the child victim in the case,' is admissible."   No. 99-2138, at *2 (quoting United States v. Bighead, 128 F.3d 1329, 1331 (9th Cir. 1997)(holding that district court did not err in admitting expert testimony on the characteristics of child sexual abuse victims)).  The Tenth Circuit went on to hold that, under the rule 403 balancing test, the district court did not err in admitting the testimony.  See No. 99-2138, at *4.

In the same way that the expert in United States v. Koruh was permitted to testify about the characteristics of sexual assault victims, without examining the victim in the case, Starr may testify about victims of domestic abuse and self-injury, without examining D. Chapman in this case.  Starr's testimony may assist the jury in understanding the reasons why D. Chapman scratched herself, and providing this information to the jury, without actually diagnosing D. Chapman, will not create undue jury confusion.  A reasonable juror will be able to receive this information and use it in his or her determination of whether to believe the United States' or L. Chapman's version of events, without being unreasonably confused on what to do with the testimony.

MOO at 40-44 (footnote omitted).

While L. Chapman calls his request a request to renew his prior motion, it is more like a motion to reconsider.  He is renewing the motion to ask the Court to reconsider its original ruling.  In a recent opinion, the Court listed three factors that it should use in considering the standard to use in addressing a motion to reconsider:

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d

[1217,] 1225 [(10th Cir. 2007)]("[T]he [law of the case] doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  (citation omitted)).  First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction, than when the prior ruling is, u.g., a short discovery ruling.  The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does[, 204 F.3d 1005 (10th Cir. 2000),] grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or

(iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2015 WL 4040616, at *21-22 (D.N.M. June 24, 2015)(Browning, J.).   Under this framework, the Court will decline L. Chapman's invitation to give a full, in-depth new look into its prior ruling.

The first factor -- how thoroughly the Court considered the challenged issue -- weighs heavily against giving L. Chapman's request.   The Court thoroughly considered the issue whether Starr could properly testify about self-harm -- without diagnosing D. Chapman -- and the Court concluded that, under Tenth Circuit precedent, she could.   Indeed, it is better that she not testify why D. Chapman cut herself -- the only reason an individual diagnosis would be aggression -- because she likely could not get by Daubert v. Merrell Dow Pharmaceuticals, Inc. with such an opinion; it is better that she simply inform the jury that a person can self-mutilate only once, something most people do not know or would not guess.   The Court also considered the prejudicial effect of the testimony and its probative value.   Moreover, unlike a motion to renew or reconsider that merely asks the Court to alter a portion of an opinion, L. Chapman asks the Court to change its entire conclusion that is the subject of a forty-eight page opinion.   The Court thoroughly considered the issue and concluded that Starr's testimony is admissible.

The second factor -- the cases' overall progress and posture -- weighs slightly in favor of the Court not altering its prior decision.   The case is on the eve of trial.   L. Chapman filed the Response two days before trial, and the Court held the October 28, 2014, hearing on the day before trial.   While the United States may be able to try this case without Starr's testimony, it would likely need to craft a new trial strategy on the night before trial.

The third factor -- whether there is new law or evidence, and whether there is a clear indication that the Court erred -- also weighs heavily in favor of the Court giving a less intense

review of its prior decision.  L. Chapman does not direct the Court to a case or statute that was

decided or passed in between the time the Court ruled on the Motion to Exclude and the time

L. Chapman filed the Response.  Similarly, while L. Chapman filed the Rapoport Notice after the

Court ruled on the Motion to Exclude, the disclaimer is not new evidence.  In the MOO, the

Court said that, if Starr testifies, she must make clear to the jury that a traumatic event is just one

of several possibilities that can account for her self-injuries.

> If Starr testifies that D. Chapman's behavior is consistent with that of a domestic abuse victim, Starr must clarify, as the United States has represented, that she cannot rule out that D. Chapman "maliciously create[d] the scratches with the intent to inculpate Chapman" or that Chapman created the scratches for any other reason.  Response at 9.  The United States has represented that Starr will testify that D. Chapman's actions are consistent with self-injury that occurs after a traumatic event, but that she will not be able testify to what occurred or why D. Chapman scratched herself.  See Response at 3, 9.  The Court will hold the United States to this representation.  If Starr testifies that D. Chapman's actions are consistent with that of a domestic abuse victim, Starr must clarify that there may be other explanations for the scratches and that she cannot opine to the true reason for the scratches.

MOO at 44.  Furthermore, because L. Chapman filed the Rapoport Notice before the Court

issued the MOO, the Court considered it in its ruling and concluded that Rapoport's proposed

testimony is consistent with the Court's holding that Starr's proposed testimony had an

established scientific basis.

> The Court notes, however, that the parties' actions to date suggest to the Court that it has gotten the issue right.  While the United States has not presented any scientific literature to support the one-self-injury incident scenario, L. Chapman has retained an expert and his notice states:
>
>> Mr. Chapman intends to call Elliot J. Rapoport, Ph.D., an expert in clinical psychology.   Dr. Rapoport is expected to testify that an expression of opinion by any expert, including the prosecution expert, as to any particular psychological reason for a one-time self-injury under the circumstances present in this case would be unfounded and speculative.  He will also testify to a variety of other possible psychological reasons for the infliction of self-injury as in this case, not to indicate that any of those possible reasons

> applies in this case, but to accurately inform the jury about the
> range of psychological possibilities that exist, beyond the one
> which has been posited by the prosecutor.
>
> Notice of Intent to Offer Expert Testimony of Elliot J. Rapoport, Ph.D. ¶ 1, at 1,
> filed October 14, 2014 (Doc. 53)("Rapoport Notice").   This description of
> Dr. Rapoport's testimony is slightly ambiguous, particularly the sentence that
> Dr. Rapoport will "testify that an expression of opinion by any expert, . . . as to
> any particular psychological reason for a one-time self-injury under the
> circumstances present in this case would be unfounded and speculative."
> Rapoport Notice ¶ 1, at 1.   This description seems to suggest that a one-time
> self-harm incident is possible, but that it would be "unfounded and speculative" to
> opine as to why the person engaged in the self-harm.   Rapoport Notice ¶ 1, at 1.
> This description suggests to the Court that L. Chapman talked to Dr. Rapoport
> and that he concluded the one-NSSI incident scenario happens and is possible.
> Rather than refuting Starr's narrow opinion, Dr. Rapoport is going to say that
> there are other possible explanations for D. Chapman's one-time self-injury.   In
> other words, Dr. Rapoport will do the same thing that Starr will do: present some
> scientific opinion, and then the jury will have to decide why D. Chapman did
> what she did.   In that sense, the expert testimony in this case is turning out to be
> rather typical: two experts squaring off, offering the jury different takes on the
> events.

MOO at 46-47 (footnote omitted).  Finally, L. Chapman does not present any evidence, law, or

argument to show that the Court clearly erred in its decision.

L. Chapman does not present any new evidence, law, or arguments to make the Court

question an issue that it thoroughly analyzed, and, after reviewing the MOO, the Court believes

that its ruling on the Motion to Exclude is correct.  Starr's testimony is not too speculative, and

she does not need to definitively diagnose D. Chapman before her testimony is helpful to the

jury.  Furthermore, because of the probative value that her testimony has in assisting the jury to

understand the reasons behind D. Chapman's conduct, the danger of unfair prejudice does not

substantially outweigh its probative value.  Accordingly, the Court will not alter its ruling on the

Motion to Exclude.

**IT IS ORDERED** that: (i) the requests in the United States' Motion to Compel

Supplemental Expert Witness Notice and to Exclude Defense Expert From Offering Opinion as

to "Unfounded or Speculative Evidence," filed October 22, 2014 (Doc. 57), are granted in part and denied in part; and (ii) the requests in Mr. Chapman's Response to the Prosecution's Motion to Compel [Doc. 57], Renewal of Motion to Preclude Government's Expert [Doc. 32] and Request to Conduct Voir Dire Examination of Prosecution's Expert Prior to Testimony Before Jury, filed October 27, 2014 (Doc. 67), are denied.  The Court will order Defendant Leslie Chapman to provide Plaintiff United States of America with a list of the psychological conditions about which Elliot J. Rapoport, Ph.D., will testify.  For L. Chapman's request to conduct a voir dire examination of Gail Starr before trial, the Court will deny the request without prejudice to renew after L. Chapman has reviewed the articles that Starr provided.  Finally, the Court will not alter its ruling in the Memorandum Opinion and Order, filed October, 27, 2014 (Doc. 70).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
William J. Pflugrath
Linda Mott
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Stephen P. McCue
   Federal Public Defender
Marc H. Robert
Kari Converse
   Assistant Federal Public Defenders
Albuquerque, New Mexico

        *Attorneys for the Defendant*